**SAN JOSE CHRISTIAN COLLEGE, a California non-profit corporation, Plaintiff–Appellant,**

v.

**CITY OF MORGAN HILL, a municipal corporation of the State of California; Dennis Kennedy; Larry Carr; Steve Tate; Hedy L. Chang; Greg Sellers, Defendants–Appellees.**

No. 02–15693.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 14, 2003.

Filed March 8, 2004.

John L. Dodd (argued), Tustin, CA; William B. Clayton, Jr., Clayton & McEvoy, P.C., San Jose, CA; Brad Dacus, June Jantz, Pacific Justice Institute, Citrus Heights, CA, for the plaintiff-appellant.

John A. Ramirez (argued), Jeffrey T. Melching, Rutan & Tucker, LLP, Costa Mesa, CA; Helene L. Leichter, City Attorney, City of Morgan Hill, for the defendants-appellees.

Geoffrey L. Robinson, Bingham McCutchen, LLP, Walnut Creek, CA; Michael S. Giaimo, Robinson & Cole, LLP, Boston, Massachusetts, for amicus curiae American Planning Association.

Roman P. Storzer, Kevin J. Hasson, Anthony R. Picarello, Jr., Christine Lockhart, The Becket Fund for Religious Liberty, Washington, DC, for amici curiae The Becket Fund for Religious Liberty and Various Christian, Jewish and Muslim Organizations.

Amy Greyson, T. Peter Pierce, Richards, Watson & Gershon, Brea, CA, for amici curiae City of Alameda and Sixty-One Other California Cities and Towns.

Before CANBY, JR., KLEINFELD, and RAWLINSON, Circuit Judges.

## OPINION

JOHNNIE B. RAWLINSON, Circuit Judge.

The clash between land use regulations and religiously-affiliated landowners continues. In this case, the City of Morgan Hill ("the City") denied a re-zoning application submitted by San Jose Christian College ("College"). Because we conclude that the City's determination did not violate College's right to the free exercise of religion, or otherwise run afoul of the Constitution, we **AFFIRM** the district court's grant of summary judgment in favor of the City.[1]

## I. FACTS/PROCEDURAL HISTORY

The City approved a conditional use permit authorizing the construction of St. Louise Hospital on a site "designated and zoned for low density multi-family residential development." The City subsequently "chang[ed] the land use designation on the St. Louise property ('the Property') from Multi-family Low Residential to Public Facilities."[2] The City ultimately re zoned the Property as a Planned Unit Development ("PUD"), thereby "eliminat[ing] the need for the use permit" and allowing use of the Property as a hospital, with fewer restrictions.

The Property is the only location within Morgan Hill actually zoned for hospital use. Under the City's municipal code, however, "[a]ll uses may be permitted in a PUD district, provided such uses are shown on the development plan for a particular PUD district as approved by the city council." MHMC § 18.30.020. Because the development plan for the PUD district in which the Property was located was directed solely at hospital use, College filed an application with the City seeking an "approval of zoning amendment to change the allowable uses on the property from a hospital and supporting medical facilities to an educational facility." A cover letter detailed College's intent to use "the site and buildings as a private college, and to allow the addition of new facilities

---

1. College did not argue in the district court or on appeal that the zoning ordinances lack a rationally-based relationship to a legitimate government interest.

2. According to MORGAN HILL MUNICIPAL CODE ("MHMC") § 18.19.010, the public facilities district "is intended to accommodate governmental, public utility, educational and community service or recreational facilities."

to serve the college." The cover letter further informed the City of anticipated "new uses such as outdoor sports fields, a gymnasium, a theater/chapel, and student resident hall(s)." College later submitted a "Statement of Operations," reiterating its "hopes and expectations for future growth at this new facility" with the "ultimate goal" to have "around 1200 students attending the College, but that will be in a perhaps 20 year time-frame." College also expressed its concern that its "projections of growth during the timeframes indicated[ ] not become imbedded in the zoning approval."

Upon receipt and review of the initial application "for completeness and accuracy of filing," the City informed College that its application was "incomplete," and outlined "the additional information needed to make the application complete." In a subsequent communication, the City informed College of the need to submit the following information, pursuant to MHMC § 18.30.050:

1. *Site plan:* Indicate landscape areas, easements and storm water detention areas. Please note that the PUD ordinance requires a minimum of 30 ft. wide landscape buffer.

2. *Illustrative building elevations:* The illustrative elevations shall indicate the level of architectural detail and quality.

3. *Landscaping:* A conceptual landscape plan needs to indicate the areas of existing landscaping and areas of proposed landscaping. The plan shall also identify the major types of plant material to be used (e.g., The species of trees and parking lot trees to be used, species of shrubbery to be used to screen parking lots, etc.).

The City's letter also requested further information regarding the use of the Property, including the number of night classes College planned to provide; the number and hours for its proposed evening sporting events as well as any large events, and whether these events would overlap with peak classroom use; whether "the 300–400 people anticipated for Sunday service in the gym" would "include the students residing on site," or reflected "people coming in from off-site"; proposed expansions; the location and detail of the lighting proposed for "the 'future' outdoor sports field" and the number of bleachers; and how many seats College's proposed theater/chapel would contain—500 or 1500.

Some of this information was required by the California Environmental Quality Act ("CEQA"), which is designed "to inform governmental decision makers and the public about the potential, significant environmental effects of proposed activities[.]" *San Joaquin Raptor/Wildlife Rescue Center v. Stanislaus County,* 42 Cal. App.4th 608, 614, 49 Cal.Rptr.2d 494 (1996). The City has incorporated CEQA into its zoning code. *See* MHMC § 18.70 *et seq.*

In lieu of providing a second application describing more fully the intended uses of the Property, and allegedly at the behest of the city manager, College presented a "scaled back" version of its initial application, encompassing the existing buildings only. The cover letter to the "scaled back" application indicated that College, at that time, did "not have a clear enough picture of [its] future facility needs to provide the information [the City] requested." The revised "Statement of Operations" reflected only 140 residents, and eliminated mention of the gymnasium, outdoor sports field, field house, and chapel/theater uses. A revised "Environmental Initial Study" stated College's intent to enroll a maximum of 400 students, rather than the 1,200 initially mentioned.

Meanwhile, College circulated two editions of its *Broadcaster* publication. The Spring 2000 *Broadcaster* communicated to its readers College's goals to "add a chapel/gym facility and additional housing." The Spring *Broadcaster* also indicated that there was "adequate space for playing fields and future expansion." The Winter 2000 *Broadcaster* reiterated that the Property "would allow the college to grow to at least quadruple from its current size of about 400 students." The Planning Commission took notice of these communications, and their apparent conflict with College's representations.

Sometime prior to the time College submitted its "scaled back" application, the City "endorsed the concept of a community health care foundation, or some other mechanism, to provide an institutional focus on meeting the policy objectives for medical services." The City formed a seven-person "Blue Ribbon Task Force on Community Health Care," the purpose of which was to explore "the medical care needs of the community of Morgan Hill, review[ ] proposals made to the· city and discover[ ] how to meet the need." After considering testimony of community residents and several proposals regarding the establishment of a medical care facility in the city, the task force verified the urgent need for a hospital in the community and recommended that the Property remain zoned for hospital use.

The City's staff disagreed with the task force's recommendation, observing that "there are no specific policies that say that the property in question must be used exclusively for a hospital," and that "the public facilities designation which is presently on the site would allow ... public, private educational facilities, and therefore, the use is consistent in that respect." Despite these positive comments, the Plan-

ning Commission recommended denial of College's re-zoning application.

The City denied College's re-zoning application due to College's failure to comply with the City's application requirements.

College subsequently filed a complaint and requested injunctive relief on the basis that the City's zoning process violated the First Amendment and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* After the district court denied College's request for a preliminary injunction, the City filed a motion for summary judgment.

The district court granted the City's motion, and College timely filed a notice of appeal to this court. On appeal, College contends that the district court's grant of summary judgment was improper because: (1) the district court applied the wrong legal standard in determining the validity of College's free exercise claim; (2) College successfully demonstrated the existence of a "hybrid" claim; (3) the district court applied "old" and "inapplicable" free exercise law to the RLUIPA analysis; (4) the application of CEQA regulations to College's re-zoning application "substantially burdened" its "religious exercise"; and (5) the City's finding that College failed to comply with CEQA regulations was not supported by substantial evidence.

## II. STANDARDS OF REVIEW

"We review *de novo* a district court grant of summary judgment." *Christian Gospel Church, Inc. v. City and County of San Francisco,* 896 F.2d 1221, 1223 (9th Cir.1990) (citation omitted). Our review "is governed by the same standard used by the trial court[.]" *Delta Savings Bank v. United States,* 265 F.3d 1017, 1021 (9th Cir.2001) (citation omitted). The appellate court· must determine, viewing the evidence in the light most favorable to the

nonmoving party, "whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Oliver v. Keller*, 289 F.3d 623, 626 (9th Cir.2002) (citation omitted). We may affirm the district court's grant of summary judgment on any basis supported in the record. *See Simo v. Union of Needletrades, Indus. & Textile Employees*, 322 F.3d 602, 610 (9th Cir. 2003).

## III. DISCUSSION

### A. The City's Denial of College's Rezoning Application Did Not Deprive College of its First Amendment Right to the Free Exercise of Religion.

"The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment, provides that 'Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof* ....' " *Employment Div., Oregon Dep't of Human Resources v. Smith*, 494 U.S. 872, 876–77, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (citing U.S. Const. amend. 1) (internal citation omitted) (emphasis in *Smith* ).

*Smith* held that a neutral law of general application could prohibit conduct that was prescribed by an individual's religion; such a law did not have to be supported by a compelling governmental interest even though it had the incidental effect of bur-

dening religion. *See id.* at 885. *Smith* also rejected a requirement of a compelling interest when the burden on religion is substantial. *Id.* at 883–84, 110 S.Ct. 1595.[3]

A few years after *Smith*, the United States Supreme Court decided *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). In *Lukumi*, the city of Hialeah enacted an ordinance prohibiting the public sacrifice of animals. *See id.* at 527, 113 S.Ct. 2217. The prohibition prevented participation in an integral part of the sect's worship rituals. *See id.* at 524–25, 113 S.Ct. 2217. Prior to finding a free exercise violation, the Supreme Court first summarized "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531, 113 S.Ct. 2217 (citation omitted). It is only if a law is not neutral or not of general applicability that we examine the "compelling governmental interest" and "narrowly tailored" prongs of the inquiry. *Id.* at 531–32, 113 S.Ct. 2217. Accordingly, "a free exercise violation hinges on showing that the challenged law is either not neutral or not generally applicable." *American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1123 (9th Cir.), *cert. denied*, 537 U.S. 886, 123 S.Ct. 129, 154 L.Ed.2d 146 (2002) (citation omitted).[4]

---

3. Congress, in the Religious Freedom Restoration Act of 1993, attempted to overturn *Smith* and reinstate the compelling interest test for governmental actions that "substantially burdened" the free exercise of religion. 42 U.S.C. § 2000bb. The Supreme Court subsequently held the Act unconstitutional in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), at least as applied to non-federal governmental action. *See Worldwide Church of God v. Phila-*

*delphia Church of God, Inc.*, 227 F.3d 1110, 1120 (9th Cir.2000).

4. College makes much of the fact that the district court cited to the portion of our *Christian Gospel Church* opinion discussing the equal protection clause. The district court's reliance on equal protection principles appears to be appropriate. The Supreme Court has approved reference to equal protection jurisprudence, declaring that "[i]n determin-

In *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the Supreme Court intimated that the "neutrality" and "generally applicable" inquiries are appropriate in cases involving zoning regulations. *See id.* at 514, 117 S.Ct. 2157 ("[W]here a general prohibition ... is at issue, the sounder approach, and the approach in accord with the vast majority of our precedents, is to hold the [compelling interest] test inapplicable to[free exercise] challenges.") (internal quotation marks and citations omitted) (final alteration in the original).

■ In *Miller v. Reed,* 176 F.3d 1202, 1206 (9th Cir.1999), we held that the rational basis test applies in ascertaining whether a neutral law of general applicability "violate[s] the right to free exercise of religion even though the law incidentally burdens a particular religious belief or practice." (citations omitted). *See also Guam v. Guerrero,* 290 F.3d 1210, 1215 (9th Cir.2002) ("The [Supreme] Court [has] held that neutral, generally applicable laws may be applied to religious practices, even when not supported by a compelling government interest.") (citation omitted). However, "the First Amendment [still] bars application of a neutral, generally applicable law to religiously motivated action" if the law implicates not only "the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press[.]" *Smith,* 494 U.S. at 881, 110 S.Ct. 1595 (citations omitted). In such "hybrid" cases, the law or action must survive strict scrutiny. *Miller,* 176 F.3d at 1204.

■ Three principles of First Amendment law may be distilled from the above-mentioned authorities. If the zoning law is of general application and is not targeted at religion, it is subject only to rational basis scrutiny, even though it may have an incidental effect of burdening religion. If such a law burdens the free exercise of religion *and* some other constitutionally-protected activity, there is a First Amendment violation unless the strict scrutiny test is satisfied (*i.e.,* the law is narrowly tailored to advance a compelling government interest). This type of First Amendment claim is sometimes described as a "hybrid rights" claim. *Id.* Similarly, if the zoning law is not neutral or generally applicable, but is directed toward and burdens the free exercise of religion, it must meet the strict scrutiny test. *See Lukumi,* 508 U.S. at 546, 113 S.Ct. 2217. Finally, if the zoning law only incidentally burdens the free exercise of religion, with the law being both neutral and generally applicable, it passes constitutional muster unless the law is not rationally related to a legitimate governmental interest. *See Miller,* 176 F.3d at 1206.

**1. The Ordinance's Incidental Burden On College's Free Exercise Right Is Lawful Due To Its Neutrality And General Applicability.**

■■ A law is one of neutrality and general applicability if it does not aim to "infringe upon or restrict practices because of their religious motivation," and if it does not "in a selective manner impose burdens only on conduct motivated by religious belief[.]" *Lukumi,* 508 U.S. at 533, 543, 113 S.Ct. 2217. The ordinance and its

---

ing if the object of a law is a neutral one under the Free Exercise Clause, we can also find guidance in our equal protection cases." *Lukumi,* 508 U.S. at 540, 113 S.Ct. 2217. Although its referral to equal protection prin-

ciples was made with reference to the "neutrality" prong of the *Smith* test, the Supreme Court has recognized that "[n]eutrality and general applicability are interrelated[.]" *Id.* at 531, 113 S.Ct. 2217.

application by the City fall within these parameters. The record reflects that the city's zoning ordinance applies throughout the entire City, and there is not even a hint that College was targeted on the basis of religion for varying treatment in the City's application of the ordinance. We are left, then, with the unavoidable conclusion that the incidental burden upon College's free exercise of religion is not violative of the First Amendment.

### 2. College Has Not Asserted A Viable Hybrid Rights Claim.

We have previously observed that "to assert a hybrid-rights claim, a free exercise plaintiff must make out a colorable claim that a companion right has been violated-that is, a fair probability or a likelihood, but not a certitude, of success on the merits." *Miller*, 176 F.3d at 1207 (citation and internal quotation marks omitted). College contends that in addition to burdening its free exercise of religion, the City's application of its zoning laws violated College's rights to freedom of speech and freedom of assembly.

### a. College Has Not Asserted a "Colorable" Claim that the City's Application of its Zoning Laws Abridged College's Freedom of Speech.

■ Citing *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) for the proposition that "[l]and use laws are subject to First Amendment scrutiny," College argues that the City's refusal to rezone the Property for educational use violates its rights to free speech. Specifically, College contends that the facilities comprising the Property constitute symbolic speech (*i.e.,* that the building itself is "speech"). College additionally asserts that its desire to use the facilities "to educate persons concerning

religion, *i.e.,* to transmit ideas · . . . is undeniably 'speech' protected by the First Amendment." We note that free speech, arguably, is not even implicated by the PUD ordinance. The City's ordinance is materially dissimilar from that at issue in *Renton*, where the ordinance did not allow a particular type of speech—adult speech—in certain locales. *See Renton*, 475 U.S. at 43, 106 S.Ct. 925. In contrast, the City's PUD ordinance does not at all prohibit the establishment of religiously-affiliated educational institutions. Indeed, under MHMC § 18.30.020, "*[a]ll* uses may be permitted in a PUD district." (emphasis added). Moreover, as the City has previously noted, "the corresponding zoning for the underlying Public Facilities land use designation would permit public or private educational facilities." *See* MHMC § 18.19.030(B). Thus, it cannot be said that the PUD ordinance prohibits religious speech.

The record reflects *no* indication that the City's action was motivated by the City's disdain of College's religious orientation, or by the message to be communicated to the students/parishioners at the Property. Thus, no viable impingement of speech claim has been asserted.

More importantly, in *Renton* the Supreme Court ruled that zoning ordinances that do not "ban" speech, but merely designate where such speech may occur, should be "properly analyzed as a form of time, place, and manner regulation." 475 U.S. at 46, 106 S.Ct. 925 (citations omitted). If the regulation is "content-neutral," it "will be upheld against a First Amendment challenge so long as it furthers a substantial governmental interest and does not unreasonably limit alternative avenues of communication." *Johnson v. City of Pleasanton*, 982 F.2d 350, 353

(9th Cir.1992), *citing Renton,* 475 U.S. at 47, 106 S.Ct. 925.[5]

■ A zoning restriction on speech is content-based only if the ordinance is shown to be a "pretext for suppressing expression." *Renton,* 475 U.S. at 48, 54, 106 S.Ct. 925 (citation omitted). If the PUD ordinance, or the enforcement thereof, "serves purposes unrelated to the content of expression[, it] is deemed neutral, even if it has an incidental effect on some" forms of speech. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (citation omitted).

The language of the City's PUD ordinance reveals no content-based orientation, and College has presented no evidence that the City enacted and/or enforced the PUD ordinance as a "pretext for suppressing expression." Rather the ordinance is a content-neutral "time, place and manner" restriction, which has "long been held to be permissible ..." *Howard v. City of Burlingame,* 937 F.2d 1376, 1381 (9th Cir. 1991) (citations omitted).

### b. College Has Not Asserted a "Colorable" Claim that the City's Application of its Zoning Laws Abridged College's Freedom of Assembly.

■ Citing *N.A.A.C.P. v. Alabama,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), College also argues that its First Amendment right to free association was abridged by the City's denial of the rezoning application.

Accepting as true, as we must, College's assertion that its collective and basic goals are to "gather[ ] together ... for the purpose of education and worship," it simply does not follow that the PUD ordinance, or the City's application of it, imposes a serious burden upon, affects in any significant way, or substantially restrains College's efforts to do so. Admittedly, the PUD ordinance and the City's enforcement thereof render College unable to provide education and/or to worship *at the Property.* But the fact that the church's congregants cannot assemble at that precise location does not equate to a denial of assembly altogether. *See Christian Gospel Church,* 896 F.2d at 1224.

### 3. Conclusion.

A review of the record in this case and controlling case authority leads us to the conclusion that the City's denial of College's re-zoning application did not deprive College of its First Amendment right to the free exercise of religion.

### B. The City's Denial of the Re-zoning Application Did Not Violate RLUIPA.

Congress enacted RLUIPA, 42 U.S.C. §§ 2000cc–2000cc–5 (2000), in response to the Supreme Court's partial invalidation of the Religious Freedom and Reformation Act of 1993 ("RFRA").[6] *See Wyatt v. Terhune,* 315 F.3d 1108, 1115 (9th Cir.2003). RLUIPA "replaces the void provisions of RFRA[,]" *id.* at 1112, and prohibits the government from imposing "substantial burdens" on "religious exercise" unless

---

**5.** Both the Supreme Court and this Court have interpreted *Renton* to apply outside of the "adult business" context. *See, e.g., Johnson,* 982 F.2d at 353.

**6.** RLUIPA provides generally:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on ... reli-

gious exercise ... unless the government demonstrates that imposition of the burden ... (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1)(A)-(B).

there exists a compelling governmental interest and the burden is the least restrictive means of satisfying the governmental interest. *See* 42 U.S.C. § 2000cc(a)(1)(A)-(B).

We have upheld RLUIPA as a constitutional exercise of Congress' spending power. *See Mayweathers v. Newland,* 314 F.3d 1062, 1066 (9th Cir.2002), *cert. den. sub nom., Alameida v. Mayweathers,* ─── U.S. ───, 124 S.Ct. 66, 157 L.Ed.2d 30 (2003). Under RLUIPA, College bears the burden of persuasion on whether the zoning laws, or the City's application of those laws to College, "substantially burdens" its "exercise of religion." 42 U.S.C. § 2000cc-2(b); *see also Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203, 1226 (C.D.Cal.2002).

■■■ RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Thus, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7)(B). Inasmuch as College intends to convert the Property from hospital use to a place for religious education, it appears that a "religious exercise" is involved in this case. The ultimate question, therefore, is whether the City has "substantially burdened" that exercise.

■■■ RLUIPA does not define "substantial burden." As always, however, "[o]ur duty, in matters of statutory construction, is to give effect to the intent of Congress." *A-Z Int'l v. Phillips,* 323 F.3d 1141, 1146 (9th Cir.2003) (citation and internal quotation marks omitted). To this end, "[i]t is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms." *Kaplan v. City of North Las Vegas,* 323 F.3d 1226, 1231-32 (9th Cir.2003) (citation omitted) (second alteration in the original). When a statute does not define a term, a court should construe that term in accordance with its "ordinary, contemporary, common meaning." *A-Z Int'l,* 323 F.3d at 1146 (citation omitted). Only if an ambiguity exists in the statute, or when an absurd construction results, does this court refer to the statute's legislative history. *See S.E.C. v. McCarthy,* 322 F.3d 650, 655 (9th Cir. 2003). The task, therefore, is to construe "substantial burden" in accordance with its plain meaning, referring back to the legislative history only if an absurd construction results.

■■■ To determine the "plain meaning" of a term undefined by a statute, resort to a dictionary is permissible. *See United States v. Sherburne,* 249 F.3d 1121, 1126 (9th Cir.2001). A "burden" is "something that is oppressive." Black's Law Dictionary 190 (7th ed.1999). "Substantial," in turn, is defined as "considerable in quantity" or "significantly great." Merriam-Webster's Collegiate Dictionary 1170 (10th ed.2002). Thus, for a land use regulation to impose a "substantial burden," it must be "oppressive" to a "significantly great" extent. That is, a "substantial burden" on "religious exercise" must impose a significantly great restriction or onus upon such exercise.

■■■ Fusing the provisions of 42 U.S.C. § 2000cc(a)(1)(A)-(B), the statutory definition of "religious exercise" set forth in 42 U.S.C. § 2000cc-5(7)(A), and the plain meaning of "substantial burden" results in the following rule: the government is prohibited from imposing or implementing a

land use regulation in a manner that imposes a "significantly great" restriction or onus on "any exercise of religion, whether or not compelled by, or central to, a system of religious belief" of a person, including a religious assembly or institution, unless the government can demonstrate that imposition of the burden on that person, assembly, or institution is: (1) in furtherance of a compelling governmental interest, and (2) the least restrictive means of furthering that compelling governmental interest.

College identifies the substantial burden in this case as its inability to use its own property "to carry on its mission[s] of Christian education and transmitting its religious beliefs." As stated previously, however, it appears that College is simply adverse to complying with the PUD ordinance's requirements. The City's ordinance imposes no restriction whatsoever on College's religious exercise; it merely requires College to submit a *complete* application, as is required of all applicants. Should College comply with this request, it is not at all apparent that its re-zoning application will be denied.

Our holding is entirely consistent with the Seventh Circuit's recent ruling in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir.2003). At issue in *Civil Liberties* was the application of the Chicago Zoning Ordinance ("CZO") to several local churches attempting to establish new sites within the city. Churches were required to obtain "Special Use" approval in order to locate within business and commercial zones, *id.* at 755, as were clubs, lodges, meeting halls, recreation buildings, and community centers. *Id.* at 758. "Special Use approval [was] expressly conditioned upon the design, location, and operation of the proposed use consistent with the protection of public health, safety, and welfare, and the pro-

posed use [could] not substantially injure the value of neighboring property." *Id.* at 755 (citation omitted). The local churches repeatedly applied for—and were denied—special use permits. The churches then sued the city, claiming, in relevant part, that the CZO violated RLUIPA, as well as their rights under the Free Exercise clause. They maintained that their Free Exercise claim involved "hybrid rights of free exercise, freedom of speech, freedom of assembly, and equal protection, such that Chicago had to justify the CZO's incidental burdens on church location with a compelling state interest." *Id.* at 765.

The Seventh Circuit rejected each claim. Specifically, Plaintiffs' RLUIPA claim failed because "the costs, procedural requirements, and inherent political aspects" of the permit approval process were "incidental to any high-density urban land use" and thus "[did] not amount to a substantial burden on religious exercise." *Id.* at 761. "While they may contribute to the ordinary difficulties associated with location (by any person or entity, religious or non-religious) in a large city, they do not render impracticable the use of real property in Chicago for religious exercise, much less discourage churches from locating or attempting to locate in Chicago." *Id.* (citation omitted).

As in the *Civil Liberties* case, the City's regulations in this case do not render religious exercise effectively impracticable. As noted above, while the PUD ordinance may have rendered College unable to provide education and/or worship at the Property, there is no evidence in the record demonstrating that College was precluded from using other sites within the city. Nor is there any evidence that the City would not impose the same requirements on any other entity seeking to build something other than a hospital on the Property. Accordingly, we **AFFIRM** the district

court's entry of summary judgment in favor of the City on College's RLUIPA claim.

### C. The District Court Did Not Err When It Granted Summary Judgment in Favor of the City on College's Claim Addressing the California Environmental Quality Act Requirements.

RLUIPA's general rule applies only when a "land use regulation," or the government's application of a land use regulation, substantially burdens a religious adherent's religious exercise in a way not representing the least restrictive means of accomplishing a compelling governmental interest. RLUIPA specifically defines a "land use regulation" as:

"[A] zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest."

42 U.S.C. § 2000cc–5(5).

"Under this definition, a government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest." *Prater v. City of Burnside*, 289 F.3d 417, 434 (6th Cir.2002).

■■■ College maintains that the City's enforcement of the requirements of the California Environmental Quality Act ("CEQA") is a "land use regulation" within the meaning of RLUIPA. We need not decide whether, in the circumstances of this case, CEQA is a "land use regulation" within the meaning of RLUIPA. Assuming, without deciding, that CEQA is such a

land use regulation, the strict scrutiny requirements of RLUIPA are not triggered because the CEQA requirements in this case did not impose a "substantial burden" on College's free exercise of religion. *See* RLUIPA, 42 U.S.C. § 2000cc(a)(1).

We have already determined that the City's denial of the rezoning application did not impose a substantial burden on College's free exercise of religion. CEQA adds nothing to the inconvenience otherwise imposed by the City's zoning application requirements. It does not burden the College's free exercise of religion to be required to delineate the nature and scope of proposed development in order to permit the City to assess its environmental effects. Compliance with the City's request will not affect College's free exercise of religion. College's RLUIPA claim with regard to CEQA accordingly fails.

### 1. Substantial Evidence Supported the City's Finding that College Failed to Comply with the CEQA Regulations.

The City based its finding that College failed to comply with the CEQA regulations on the fact that College's "environmental analysis [did not] consider the foreseeable future development and potential impacts of such development ..." In making its finding, the City took notice of the discrepancy between the plans submitted to the City in College's application and the far more grandiose plans touted in College's newsletters. It was reasonable for the City to conclude that the truncated plans were proffered to the City to avoid addressing the environmental impacts of the more ambitious plans. *See, e.g., Laurel Heights Improvement Assn. v. Regents of Univ. of California*, 47 Cal.3d 376, 396, 253 Cal.Rptr. 426, 764 P.2d 278 (1988); *see also City of Redlands v. County of San Bernardino*, 96 Cal.App.4th 398, 409–10,

117 Cal.Rptr.2d 582 (2002) (holding that County failed to comply with CEQA because it failed to adequately consider "reasonably anticipated future development").

## IV. CONCLUSION

We conclude that the City's zoning requirements are general laws of neutral application that do not violate the Free Exercise Clause of the First Amendment. We further conclude that neither the zoning laws nor CEQA impose a substantial burden on College's free exercise of religion and that, accordingly, the strict scrutiny requirement of RLUIPA is not triggered. The City reasonably determined that College had failed to meet the requirements of its zoning ordinance and CEQA. Because College failed to raise a genuine issue of material fact regarding its claims, entry of summary judgment in favor of the City was appropriate. *See King County v. Rasmussen,* 299 F.3d 1077, 1090 (9th Cir.2002). The judgment of the district court is **AFFIRMED.**