Daniel MINTZ; Andrea Winter; James and Sandra Biancolo; Ann Phillips; Steven Baum; Carol Winston; Vernon and Donna Kohlenberger; Lawrence and Pamela Wolfe; Craig and Melissa Pehlert; and Robert and Jane Hackmann, Plaintiffs

v.

ROMAN CATHOLIC BISHOP OF SPRINGFIELD, Thomas L. Dupre, Bishop; Arlene D. Schiff, Clifford Snyder, Harold Brown, Jeff Hall and Ned Douglas; and Edwin May, Defendants.

No. CIV.A.04–10809–KPN.

United States District Court, D. Massachusetts.

March 30, 2006.

Daniel H. Mintz, Lenox, John R. Gobel, Gobel & Hollister, Pittsfield, for Daniel Mintz, Andrea Winter, James Biancolo, Sandra Biancolo, Vernon Kohlenberger, Donna Kohlenberger, Lawrence Wolfe, Pamela Wolfe, Craig Pehlert, Melissa Pehlert, Robert Hackmann, Jane Hackmann, Plaintiffs.

Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, PC, Springfield, Peter F. Heller, Heller & Associates, Lenox, Hugh C. Cowhig, Hannon, Lerner, Cowhig, Scully & Bell, Jerome J. Scully, Hannon, Lerner, Cowhig, Scully & Bell, Lee, for The Roman Catholic Bishop of Springfield, Bishop Thomas L. Dupre, Arlene D. Schiff, Clifford Snyder, Harold Brown, Jeff Hall, Ned Douglas, Edwin May, Defendants.

## MEMORANDUM AND ORDER WITH REGARD TO CROSS MOTIONS FOR SUMMARY JUDGMENT (Document Nos. 23 and 26)

NEIMAN, United States Magistrate Judge.

This is an appeal by a number of home owners ("Plaintiffs") in Lenox, Massachusetts, of a March 5, 2004 decision by the Lenox Zoning Board of Appeals pertaining to property owned by the Roman Catholic Bishop of Springfield ("the diocese"). Plaintiffs, who are abutters to the property, have sued the diocese, members of the Zoning Board of Appeals ("the ZBA") and Lenox's Assistant Building Inspector Edwin May ("May") (together "Defendants"). The appeal was originally filed in the Massachusetts Land Court pursuant to Mass. Gen. L. ch. 40A, § 17. It was thereafter

removed to federal court by Defendants because Plaintiffs based part of their appeal on questions arising under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, and the United States Constitution.

The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). Presently before the court are Plaintiffs' and the diocese's cross motions for summary judgment, which motions walk the fine line between the rights of religious institutions under RLUIPA and the concerns of abutters. The ZBA and May have remained silent, evidently content to have the diocese carry their arguments. For the reasons which follow, the court will allow the diocese's motion for summary judgment, apply that ruling to the remaining defendants (the ZBA and May), and deny Plaintiffs' cross motion for summary judgment.

## I. *Background*

The following background comes primarily from the diocese's Local Rule 56.1 statement (Document No. 25, hereinafter "Def.'s Facts") and Plaintiffs' counter statement (Document No. 27, hereinafter "Pls.' Facts"). Unless otherwise noted, the facts which follow are undisputed.

The diocese is the owner of land in Lenox (hereinafter "the town") which contains a church and rectory known as St. Ann's Parish ("St.Ann's"). (Def.'s Facts ¶ 1.) The property is located near the center of town in an area zoned "R–15," *i.e.*, residential with a minimum lot size of 15,000 square feet. (*Id.* ¶ 2.) Religious uses are permitted within the R–15 zone. (*Id.* ¶ 3.) According to Plaintiffs, during church services and functions, cars and parishioners "regularly park on the street in violation of posted 'no parking' areas" and "regularly block traffic while entering and exiting St. Ann's property." (Pls.' Facts ¶¶ 1, 2.) The diocese disputes these characterizations.

The instant controversy centers around St. Ann's proposal in 2003 to construct a parish center which would include a 150–person social hall, a kitchen, office space, and handicap-accessible bathrooms. (See Def.'s Facts ¶¶ 11, 17; Pls.' Facts ¶ 3.) Some years ago, St. Ann's did not purchase another parish center in town when it became available. (Pls.' Facts ¶ 8). Apparently, its parishioners did not want to travel any distance to a parish center. (*Id.* ¶ 9.)

St. Ann's rectory used to house two priests but presently houses only one. (*Id.* ¶ 6.) Since 1987, St. Ann's priest also pastors another church in town, St. Vincent de Paul. (*Id.* ¶ 7.) Currently, however, the rectory holds three offices: one for the pastor, one for an administrative assistant, and one for the director of religious education (which is located in a former bedroom on the second floor). (Def.'s Facts ¶¶ 7, 9.) Meetings are also held in the rectory's living, dining room and kitchen, although the parish council must often meet at an outside location because of its size. (*Id.* ¶¶ 8, 10.) The new parish center, in the diocese's view, would alleviate these concerns.

Section 9.18 of the town's zoning bylaw ("the bylaw") contains the following provisions which apply only to religious and private educational uses:

> Any non-municipal educational use or any religious use is subject to the following regulations:
>
> (a) Maximum building height—2 stories or 35 feet.
>
> (b) Maximum building coverage—4%
>
> (c) Setback—two hundred (200) feet buffer surrounding the property to be kept undeveloped except for entrance and exit roadways.

(d) Major access roads and major parking areas subject to frequent use day or night shall be paved. Major roads are to be eighteen (18) feet wide and shall not exceed a 7½% grade.

(e) Parking areas shall be screened as provided in Section 2: DEFINITIONS—SCREENING—(a) and (c).

(f) Parking areas shall be within three hundred (300) feet of the building to be served.

(g) Parking requirements:

1. Places of assembly: 1 space for every three (3) seats.

2. Classrooms and/or dormitories:

Grade 1–10 1 space for each staff member[.]

Grades 10–12 1 space for each staff member plus 1 space for every two students.

College 1 space for each staff member plus two (2) spaces for every three (3) students.

(Def.'s Facts ¶ 13. A copy of the bylaw is attached as Def.'s Ex. 1.)

Of particular relevance here is the "maximum building coverage" restriction of four percent since, according to the diocese, the proposed parish center would contain about 3,370 square feet and, accordingly, cover more than four percent of the diocese's property. (See *id.* ¶¶ 12, 14. See also Complaint ¶ 29 (indicating that if the proposed parish center were built, the lot's total building coverage will be thirteen percent).) Other uses regulated by the bylaw have maximum building coverage restrictions in the range of five to thirty-five percent. (See Def.'s Facts ¶ 15; Def.'s Ex. 1 §§ 8.4, 9.14.1.) For their part, Plaintiffs note that the current rectory is 4,170 square feet while the rectory at another church in town (St. Vincent de Paul, which is occupied by a diocesan official) is only 3,558 square feet. (Pls.' Facts ¶¶ 5, 6.)

Several other bylaw provisions related to section 9.18 are also relevant here. For example, section 10.6, like section 9.18, mentions a "three to one" parking ratio for places of assembly, *i.e.*, one parking space for "each three seats." (See Def.'s Ex. 1 §§ 9.18(g)(1) and 10.6.) Sections 8.1 and 8.2 concern frontage and lot width requirements. (*Id.* §§ 8.1 and 8.2.) And section 5.1 provides that a non-conforming use or structure shall not be changed, extended or enlarged in any manner, unless the ZBA grants a special permit, the requirements for which are described in section 5.5. (*Id.* §§ 5.1 and 5.5.)

In 2000, several years prior to the events at bar, Congress passed RLUIPA. (Def.'s Facts ¶ 16.) Three years later, on October 8, 2003, St. Ann's applied for a building permit for the parish center. (*Id.* ¶ 17.) Given that the plans themselves could not conform to section 9.18, the diocese filed a legal brief with the building inspector contending that RLUIPA required that the town not enforce the bylaw and, therefore, that the permit be granted. (*Id.* ¶ 18.) This prompted May, as assistant building inspector, to request an opinion from special town counsel. (*Id.* ¶ 19.)

On November 20, 2003, special town counsel, David Dubendorf ("Dubendorf"), issued an opinion that section 9.18 of the bylaw violated RLUIPA and, therefore, that the permit should be granted. (*Id.* ¶¶ 20, 21.) In pertinent part, Dubendorf's opinion letter provided as follows:

Keeping in mind that RLUIPA commands us to construe the statute broadly in favor of religious exercise, it does appear that § 9.18 of the Bylaw prevents St. Ann's from "engaging in conduct ... that is central to [its] religious doctrine," and that the application of § 9.18 is "more than an inconvenience"

to St. Ann's. Therefore, it is our opinion that St. Ann's would meet the substantial burden element under RLUIPA.

. . . .

... [I]t is difficult to see what th[e] compelling interest [of the town] might be in light of the uses allowed at the Church site under the Bylaw. If the Town's compelling interest was to protect the health, safety and general welfare of the Town's inhabitants by reducing traffic and minimizing activity in that general area, it is unclear why then the Bylaw would permit the use of the Church site for a municipal use, private nonprofit library or museum, post office or medical professional offices.... As such, it is difficult to support the position that § 9.18 of the Bylaw furthers a compelling governmental interest....

The Town of Lenox would also have a struggle in withstanding a challenge to the discriminatory nature of § 9.18.... [I]t is our opinion that § 9.18 of the Bylaw violates the anti-discrimination provision of RLUIPA.

(A copy of the opinion letter is attached as Def.'s Ex. 3(E). See also Def.'s Facts ¶ 21.) May issued a permit on November 26, 2003, albeit with a condition that, to conform to parking regulations, the parish center and the church could not operate at the same time. (Def.'s Facts ¶ 22.)

On December 18, 2003, Plaintiffs filed an appeal with the ZBA. (*Id.* ¶ 23.) They asserted that the building permit should be revoked as violating various sections of the bylaw. (*Id.*) Hearings were held over three days, the first being January 21, 2004. (*Id.* ¶ 24.) That day, as described by Plaintiffs, there were comments by St. Ann's officials and parishioners, presentations by both Philip Heller, the attorney who had submitted the diocese's legal brief, and Dubendorf, the special town counsel who had issued the opinion letter

to May, and testimony by May himself. (See Complaint ¶ 21; Document No. 28, hereinafter "Pls.' Brief," at 4–5.) In addition, Plaintiffs' counsel submitted a letter. (Complaint ¶ 21 and Ex. H.) The hearings continued on February 12th and 26th. (Complaint ¶¶ 21 and 22.) Following the hearings, the ZBA voted 5–0 to uphold the building permit (including the condition that the parish center and church not operate at the same time) and required as well that fifty additional parking spaces be added to the site. (See *id.* ¶ 23; Def.'s Facts ¶ 25.)

Litigation ensued. As indicated, Plaintiffs filed their complaint, containing eight causes of action, in the Massachusetts Land Court on March 23, 2004. The First, Second, Third and Fourth Causes of Action (hereinafter "Counts I through IV") allege that "[May] and the ZBA exceeded their authority and acted unreasonably in not requiring the Diocese to comply with Section 9.18" and the related bylaw provisions concerning building coverage and setbacks (Count I), parking (Counts I and II), frontage and lot width (Count III), and permitting (Count IV). (Complaint ¶¶ 32, 40, 45 and 50.) The Fifth Cause of Action (hereinafter "Count V") alleges that "[May] and the ZBA exceeded their authority and acted unreasonably in failing to consider the reasonable regulations set forth in [Mass. Gen. L. ch. 40A, § 3]." (*Id.* ¶ 57.) The Sixth Cause of Action (hereinafter "Count VI") alleges that "[May] and the ZBA exceeded their authority and acted unreasonably in failing to consider the evidence necessary to determine that the [bylaw was] preempted by RLUIPA." (*Id.* ¶ 62.) The Seventh Cause of Action (hereinafter "Count VII") alleges that the application of RLUIPA by May and the ZBA to the building permit was "unconstitutional for, among other [sic], the fact that it (i) violates the Establishment Clause of the

First Amendment of the United States Constitution and (ii) constitutes a taking of [Plaintiffs'] property in violation of the Fifth and Fourteenth Amendments of the United States Constitution." (*Id.* ¶ 65.) Finally, the Eighth Cause of Action (hereinafter "Count VIII") alleges that "[May] and the ZBA exceeded their authority and acted unreasonably in failing to refer the Diocese permit application to the Historic District Commission prior to granting or upholding the building permit." (*Id.* ¶ 72.)

Since the complaint raised a federal question with regard to RLUIPA, Defendants removed the action to this court on April 23, 2004. In due course, the diocese and Plaintiffs filed cross motions for summary judgment and the court heard oral argument.

## II. SUMMARY JUDGMENT STANDARDS

When ruling on a motion for summary judgment the court must construe the facts in a light most favorable to the non-moving party. *Benoit v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir.2003). Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" when the evidence is such that a reasonable fact-finder could resolve the point in favor of the nonmoving party, and a fact is "material" when it might affect the outcome of the suit under the applicable law. *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir.1994). The nonmoving party bears the burden of placing at least one material fact into dispute after the moving party shows the absence of any disputed material fact. *Mendes v. Medtronic, Inc.*, 18 F.3d 13, 15 (1st Cir.1994) (discussing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The mere fact that both parties move for summary judgment does not change the foregoing analysis. *United Paperworkers Int'l Union, Local 14 v. Int'l Paper Co.*, 64 F.3d 28, 32 n. 2 (1st Cir.1995).

## III. DISCUSSION

The court will first consider the diocese's motion for summary judgment and then turn to Plaintiff's cross motion. In the end, the court will conclude, for the reasons described, that the diocese, as well as the ZBA and May, are entitled to summary judgment, while Plaintiffs are not.

It should be noted at the outset, however, that the particular alignment of the parties—an appeal by abutters against both the landowner and the zoning board—is somewhat unique. In the more common case involving RLUIPA and land use, a religious organization is pitted against a governmental entity that has allegedly treated that organization on less than equal terms than non-religious organizations or has discriminated against that organization on the basis of religion. Here, however, the usual protagonists are allied. The diocese is not complaining about the ZBA's treatment of its application for a building permit nor is it contesting the conditions set for that permit. In fact, the diocese and the ZBA agree that the parish center falls within the "religious exercise" of St. Ann's adherents and that the bylaw—which would prevent the construction of the parish center as proposed—imposed a "substantial burden" on that exercise. Thus, in contrast to the usual scenario, the complaining parties here are abutters to the religious institution who believe that the governmental entity failed to properly fulfill its obligations under a zoning bylaw and applicable state statutes.

### A. THE DIOCESE'S MOTION FOR SUMMARY JUDGMENT

The court divides its discussion of the diocese's motion into six parts. First, the

court will consider, and reject, the diocese's argument that a 2005 amendment to the bylaw renders most of Plaintiffs' claims moot. Second, given the gravity of the charge, the court will address Plaintiffs' claim in Count VII that RLUIPA is unconstitutional. Third, the court will discuss the standard of review applied to zoning appeals. Fourth, reaching the heart of the case, the court will apply that standard to Counts I, II and IV (and parts of Counts V and VI), *i.e.*, Plaintiffs' causes of action which challenge the ZBA's decision with respect to section 9.18 of the bylaw and its related provisions, hereinafter the "bylaw counts." That process necessarily entails a detailed consideration of RLUIPA. Fifth, the court will discuss the remaining issues arising under Counts V and VI. And finally, the court will address Plaintiffs' last claim, Count VIII.[1]

### 1. *New Bylaw*

■ On May 5, 2005, the bylaw was amended at the Annual Town Meeting to add the following provision, section 9.18.1: "Any property located in the Commercial C Zone or Residential R–15 Zone used primarily for religious purposes shall be exempt from the provisions of this Section 9.18." (Def's Facts ¶ 26.) In its memorandum of law, the diocese noted that the amendment had yet to be approved by the Attorney General. At oral argument, however, Plaintiffs informed the court that approval had since been received.

In any event, the diocese asserted on the final page of its memorandum of law that, as a result of the amendment, the "burdensome and discriminatory provisions" of the bylaw would be eliminated and, accordingly, that most of Plaintiffs' causes of action

were moot. Plaintiffs disagreed, asserting that the diocese's permit can only be judicially reviewed with respect to the existing, *i.e.*, the original, bylaw. If the diocese believed that the amendment has mooted the substantive claims, Plaintiffs averred, it should withdraw its permit and voluntarily dismiss the action.

Such a dismissal, of course, would require the diocese to recommence the zoning process. As the diocese points out, however, the instant dispute is not a situation where St. Ann's has applied for and been denied a permit under a provision that was later repealed. In other words, the new bylaw does not moot any of Plaintiffs' claims. Moreover, the exact effect of the new bylaw is uncertain at this time. Since neither side wishes to budge from their present postures, the court has little choice but to address Plaintiffs' claims under the pre-existing bylaw in accordance with the standard of review.

### 2. *Constitutionality of RLUIPA (Count VII)*

■ As described, Count VII seeks a declaration that RLUIPA's land use provisions are unconstitutional. In their memorandum of law, however, Plaintiffs state merely that "there is insufficient consensus on this issue to merit a ruling on summary judgment." (Pl.'s Brief at 25–26.) Putting aside for the moment whether such a "consensus" actually would resolve the issue for this court, Plaintiffs have bypassed the issue entirely and have pursued their remaining arguments on the assumption that RLUIPA is constitutional. The diocese, of course, deems RLUIPA constitutional.

Given Plaintiffs' position in particular, there is no reason why the court should

---

1. Plaintiffs conceded at oral argument that they are no longer pursuing Count III since the plan filed with the permit apparently shows more than enough frontage and width for the proposed parish center. Accordingly, the diocese's motion with respect to Count III will be allowed.

not assume RLUIPA's land use provisions constitutional. That, in fact, appears to have been the position of nearly every court which has considered the issue. *See, e.g., Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1237–43 (11th Cir. 2004) (examining issues in detail and holding RLUIPA constitutional); *San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024, 1034 (9th Cir.2004) (assuming RLUIPA's constitutionality based on earlier Ninth Circuit case involving prisoner rights); *Cottonwood Christian Ctr. v. Cypress Redev. Agency,* 218 F.Supp.2d 1203, 1221 n. 7 (C.D.Cal.2002) (noting that RLUIPA appears to have avoided constitutional pitfalls of RFRA); *Freedom Baptist Church v. Twp. of Middletown,* 204 F.Supp.2d 857, 863 (E.D.Pa.2002) (holding that RLUIPA is constitutional in first case to address the issue). Plaintiffs cite only one decision from the Central District of California deeming RLUIPA's land use provisions unconstitutional, *see Elsinore Christian Ctr. v. City of Lake Elsinore,* 291 F.Supp.2d 1083, 1096–1104 (C.D.Cal. 2003), but that district court ruling came prior to the Ninth Circuit's *San Jose Christian College* decision. For its part, the Supreme Court recently upheld as constitutional that part of RLUIPA which deals with institutionalized persons. In doing so, the Court reaffirmed "that there is room for play in the joints between the Free Exercise and Establishment Clauses, allowing the government to accommodate religion beyond free exercise requirements, without offense to the Establishment Clause." *Cutter v. Wilkinson,* 544 U.S. 709, 125 S.Ct. 2113, 2117, 161 L.Ed.2d 1020 (2005) (citations and internal quotation marks omitted). Accordingly, the diocese's motion with respect to Count VII will be allowed.

### 3. *Standard of Review*

The standard for reviewing a local zoning board decision pursuant to Mass. Gen. L. ch. 40A, § 17 is well established. In essence, the court is required to hear *de novo* all issues raised on appeal, make independent findings of fact and determine the legal validity of a zoning board's decision upon the facts found. *See Roberts v. Southwestern Bell Mobile Sys., Inc.,* 429 Mass. 478, 709 N.E.2d 798, 804 (1999) (citing *Josephs v. Bd. of Appeals of Brookline,* 362 Mass. 290, 285 N.E.2d 436, 439 (1972)). A zoning board's decision carries no particular evidentiary weight on appeal. *Id.* However, in order to set aside a zoning board's decision, the court must find, in light of all the evidence, that the decision was "based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon v. Bd. of Appeals of Duxbury,* 356 Mass. 635, 255 N.E.2d 347, 350 (1970) (citation omitted).

As it turns out, the parties here rely on a summary judgment record with few facts offered *de novo.* The court is also hampered somewhat by not having before it a transcript of the ZBA hearings (other than one snippet). When necessary, therefore, the court relies on the parties' descriptions of those hearings. In any event, as will be made clear, the parties raise primarily questions of law. Accordingly, the court will consider Plaintiffs' various claims pursuant to the standards articulated in Mass. Gen. ch. 40A, § 17, focusing, as necessary, on the decision of the ZBA. Moreover, since the court's analysis is framed initially within the context of the diocese's motion for summary judgment, the court will consider any factual disputes which might surface in a light most favorable to Plaintiffs.

### 4. *The Bylaw Counts (Counts I, II and IV as well as Counts V and VI)*

Counts I, II and IV target section 9.18 and the related bylaw provisions concerning building coverage, setbacks, parking

and permitting. Analysis of those claims—as well as Counts V and VI insofar as they, too, implicate the bylaw—necessarily entails a detailed consideration of RLUIPA. Plaintiffs assert in broad terms that each of these counts arises out of the misapplication of RLUIPA by the town. The essence of their argument is that the ZBA "exceeded [its] authority and acted unreasonably in not requiring the diocese to comply with" the bylaw. In particular, Plaintiffs assert that it was erroneous for the ZBA to conclude, as it did, that section 9.18 violated RLUIPA. The diocese, of course, disagrees, arguing that section 9.18 violated RLUIPA in a variety of ways and that, as a result, the ZBA acted appropriately. In the court's opinion, the diocese's argument is more persuasive.

### a. The Statutory Scheme

RLUIPA is the successor to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb et seq., enacted in 1994 and then declared partially unconstitutional, see City of Boerne v. Flores, 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). It is, however, "narrower in scope, in that it applies only to governmental actions affecting land use and institutionalized persons, and establishes several jurisdictional limitations not included in RFRA." Regulating Historic Religious Properties Under RLUIPA (NTHP Preservation Law Reporter Education Materials, 2005), SL014 ALI–ABA 719, 722 (Nov. 2005). Taken together, these limitations represent Congress' attempt to overcome

the Supreme Court's concerns when it declared RFRA unconstitutional as applied to state and local governments. See id.[2]

Several RLUIPA provisions are arguably at issue in the present dispute. The main portion of the statute, section 2000cc entitled "Protection of land use as religious exercise," bars governments from imposing a "substantial burden" on religion with respect to certain land use regulations:

(1) . . . No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Section 2000cc continues with certain "equal terms," "nondiscrimination" and "unreasonably limits" provisions:

(1) Equal terms[.] No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

(2) Nondiscrimination[.] No government shall impose or implement a land use regulation that discriminates against any

---

**2.** Congress dealt with Boerne in at least two ways. Id. First, it built a legislative record of land use discrimination against religious institutions. See id. at 722–23. Second, it sought to overcome certain jurisdictional issues by requiring that the substantial burden on religious exercise result from state or local governmental activities that received federal financial assistance, affected commerce with foreign nations, or were imposed by a land

use regulation that has procedures or practices in place that permit the government to make individualized assessments of the proposed uses for the property involved. See id. at 723; 42 U.S.C. § 2000cc(a)(2). RFRA, it should be noted, still applies to the federal government. See Regulating Historic Religious Properties Under RLUIPA, SL014 ALI–ABA at 722 n. 1.

assembly or institution on the basis of religion or religious denomination.

(3) Exclusions and limits[.] No government shall impose or implement a land use regulation that—

(A) totally excludes religious assemblies from a jurisdiction; or

(B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

42 U.S.C. § 2000cc(b). Finally, another portion of RLUIPA, which the parties also cite, allows for "[g]overnmental discretion in alleviating burdens on religious exercise":

A government may avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.

42 U.S.C. § 2000cc–3(e).

b. *Does the Bylaw Pose a Substantial Burden on Religious Exercise?*

With regard to RLUIPA, Plaintiffs first argue that is was improper for the ZBA to have concluded that the bylaw, which the parties agree would bar the construction of the parish center as proposed, imposed a "substantial burden" on the diocese's "religious exercise." The court separately addresses the two subparts of this argument: (1) whether the diocese's "religious exercise" was involved; and (2) if so, whether the bylaw would impose a "substantial burden" on that exercise.

(i) *Religious Exercise*

■ RLUIPA defines "religious exercise" as follows:

(A) In general[.] The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief. (B) Rule[.] The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

42 U.S.C. § 2000cc–5(7). The diocese acknowledges that the parish center is an "ancillary" use under the bylaw. Nonetheless, the diocese asserts here, as it had before the ZBA, that the parish center is "central" to the church's mission and, hence, part of its "religious exercise." *Compare Needham Pastoral Counseling Ctr., Inc. v. Bd. of Appeals of Needham*, 29 Mass.App.Ct. 31, 557 N.E.2d 43, 46–47 (1990) (upholding denial of permit for pastoral counseling center which would resemble mental health counseling more than religious activity). Plaintiffs hardly disagree.

The court finds that the activities to be conducted in the parish center encompass "religious exercise." As indicated, to qualify as "religious exercise" under RLUIPA, the practice need not be "compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Moreover, religious exercise includes "[t]he use, building or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc–5(7)(B). Of course, every building owned by a religious organization does not fall within this definition. Buildings used by religious organizations for secular activities or to generate revenue to finance religious activities are not automatically protected. *See, e.g., Westchester Day Sch. v. Village of Mamaroneck*, 386 F.3d 183,

189–90 (2nd Cir.2004) (rejecting as too expansive trial court's determination that renovation of a religious school, which would include rooms for secular functions, was entirely "religious"). Here, however, the ZBA found that the parish center "is both central to and necessary to St. Ann's programs and church services" and "is a reasonable extension of St. Ann's Church's religious use of its property." (Def.'s Ex. 3(A) (ZBA Decision) ¶¶ 20(a) and 24.) Based on the record, this court, too, finds that the proposed parish center falls well within the definition of "religious exercise." It would house an office for religious education and would serve as a meeting place for the parish council. It would also be the locus of small gatherings related to church services, as well as other functions presently being performed in the rectory.[3]

### (ii) Substantial Burden

■ The next question raised by Plaintiffs' initial argument is whether the bylaw imposes a "substantial burden" on St. Ann's acknowledged religious exercise. RLUIPA, unfortunately, does not define "substantial burden." At best, its legislative history clarifies that a substantial burden on religious exercises "must be established 'by reference to Supreme Court jurisprudence' under the Free Exercise clause of the First Amendment." *Regulating Historic Religious Properties Under RLUIPA*, SL014 ALI–ABA at 724 (quoting 146 Cong. Rec. S. 7776 (July 27, 2000)). For its part, the Supreme Court had made clear in other contexts that the "substantial burden" hurdle is high and that the issue is intensely fact-specific. *See, e.g., Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (finding burden when government puts "substan-

tial pressure on an adherent to modify his behavior and to violate his beliefs"); *Wisconsin v. Yoder,* 406 U.S. 205, 234–35, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (compulsory school attendance law and criminal sanctions for noncompliance interfered with free exercise rights of Amish); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (finding burden when individual is required "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand"). *But see Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (no burden where government action interferes with, but does not coerce, individual's beliefs) (citing *Bowen v. Roy,* 476 U.S. 693, 699–700, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)); *Braunfeld v. Brown,* 366 U.S. 599, 605, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (no burden where regulation made religious observation more expensive).

Despite the definitional fluidity, Plaintiffs assert that the diocese's inability under the bylaw to construct an accessory use to a house of worship does not constitute a substantial burden under RLUIPA as a matter of *law.* The court disagrees. Although several circuit courts have used a variety of standards to determine a substantial burden, those standards, as might be expected, invariably are tied to the facts of the particular case, as is true here as well.

In *Midrash Sephardi,* for example, the Eleventh Circuit indicated that a "substantial burden" is one which "place[s] more than an inconvenience on religious exercise" and is "akin to significant pressure

---

**3.** Several of these facts were presented in the diocese's memorandum in support of its application for the building permit. Absent a transcript of the later ZBA hearings, the court can fairly infer that these same representations were made at those hearings.

which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.*, 366 F.3d at 1227. Applying that standard, the Eleventh Circuit found that a zoning provision which excluded religious uses in a business district did not impose a substantial burden on the exercise of religion even though the provision made it harder for some members of two Jewish congregations to walk to the synagogue on the Sabbath. *Id. But see id.* at 1230–40 (holding that disparate treatment of synagogues violated RLUIPA's "equal terms" provision). In *San Jose Christian College*, the Ninth Circuit stated that the city was "prohibited from imposing and implementing a land use regulation in a manner that imposes a 'significantly great' restriction or onus on any 'exercise of religion,'" but upheld the denial of an application to rezone a site from hospital use to educational use because the city's regulations "d[id] not render religious exercise effectively impracticable." *Id.*, 360 F.3d at 1034–35. Similarly, in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752 (7th Cir.2003), the Seventh Circuit determined that "a land-use regulation that imposes a substantial burden on religious exercises is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise-including the use of real property for the purpose thereof within the regulated jurisdiction generally-effectively impracticable." *Id.* at 761. The First Circuit has not weighed in on the issue. In any event, this court finds it impossible to declare, Plaintiffs' arguments to the contrary, that the inability to construct a building which is an accessory use cannot be a substantial burden as a matter of law.

As a second line of argument, Plaintiffs assert that the diocese, as a matter of *fact*, did not adequately demonstrate that the bylaw imposed a "substantial burden" on St. Ann's religious practices. To factually show a substantial burden, Plaintiffs assert, the diocese had to prove that the bylaw burdened the practice of religion by preventing St. Ann's adherents from engaging in conduct or having a religious experience that their faith mandates. *See Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995) (construing RFRA). Moreover, Plaintiffs argue, the burden must be more than an inconvenience, *i.e.*, it must interfere with a tenet or belief that is central to religious doctrine. *See id.*

In pursuing this line of attack, Plaintiffs aim most of their argument at the advisory opinion given to the assistant building inspector, May, by Dubendorf, the special town counsel. Dubendorf recognized, appropriately, that in accord with RLUIPA, the diocese had to establish that the bylaw imposed a substantial burden. He then opined that the diocese met the test:

> Keeping in mind that RLUIPA commands us to construe the statute broadly in favor of religious exercise, it does appear that § 9.18 of the Bylaw prevents St. Ann's from "engaging in conduct ... that is central to [its] religious doctrine," and that the application of § 9.18 is "more than an inconvenience" to St. Ann's.

(Def.'s Ex. 3(E) at 3.) This advice, Plaintiffs argue, was conclusory at best, based as it was on the uncontested assertions proffered at the time by the diocese in support of its permit application.

Plaintiffs' argument in this regard has some resonance. When issuing the building permit, May appears to have relied almost exclusively on Dubendorf's advisory opinion. Plaintiffs fail to fully appreciate, however, that it was the ZBA, not Dubendorf, that ultimately considered the issue and, after three hearings, concluded that St. Ann's had established that the bylaw imposed a "substantial burden" on its ad-

herents' exercise of religion. And on the present record, the court agrees. As described, the parish center would serve as a meeting place for the parish counsel, would include an office for religious education, could facilitate gatherings related to church services and would, in the process, alleviate crowding in the rectory. The inability of St. Ann's to build the parish center would substantially burden all these religious activities. *See* also *Young Israel Org. of Cleveland v. Dworkin,* 105 Ohio App. 89, 133 N.E.2d 174, 176 (1956) (noting centrality of meeting rooms, clubs rooms and classrooms).

To be sure, Plaintiffs, citing affidavit and deposition testimony, make much of the fact that St. Ann's has flourished for ninety years, has enabled its adherents to exercise their religion within its structural limitations and could make certain accommodations within its existing structures to meet its ongoing religious needs. *See Episcopal Student Found. v. City of Ann Arbor,* 341 F.Supp.2d 691, 704 (E.D.Mich. 2004) (denial of permit—to demolish building that was inadequate to fulfill plaintiff's religious needs—did not substantially burden free exercise rights because plaintiff's needs could be addressed by leasing new space or by expanding or renovating the building). Indeed, Plaintiffs argue, RLUIPA was not even intended to apply to the present situation which involves a well-established, mainline congregation. Rather, they assert, Congress was concerned with discrimination against "small and unfamiliar" denominations as well as zoning patterns which limited "new religious groups" from moving into a community, neither of which is the case here.

The court does not take so cramped a view of RLUIPA, and its legislative history is instructive in this regard. While Congress no doubt was concerned about "unfamiliar" religions, that concern was not exclusive:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes. The hearing record compiled massive evidence that this right is frequently violated. Churches, in general, and new small, or unfamiliar churches in particular, are frequently discriminated against in the fact of zoning codes and also in highly individualized and discretionary processes of land use regulation.

146 Cong. Rec. S. 7774–5 (July 27, 2000) (as quoted in *Cathedral Church of the Intercessor v. Inc. Vill. of Malverne,* 353 F.Supp.2d 375, (E.D.N.Y.2005)). As is clear, Congress was equally concerned with "churches and synagogues . . . in general." *Id.*

Moreover, as applied here, the bylaw would preclude *any* additional construction on property owned by a religious institution, yet another concern of RLUIPA. The statute defines "land use regulation," in pertinent part, as "a zoning or land-marking law, or the application of such a law, *that limits or restricts a claimant's use or development of land (including a structure affixed to land),* if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land." 42 U.S.C. § 2000cc–5(5) (emphasis added). This provision applies as equally to the facts here as to an "unfamiliar" church seeking to build its first sanctuary. *See Board of Zoning Appeals of Elkhart County v. New Testament Bible Church, Inc.,* 411 N.E.2d 681, 685 (Ind.Ct.

App.1980) ("[I]f one is entitled to build a church, he may not be denied the opportunity to build accessories as well."). The statute certainly does not contemplate that a church's religious exercise can be frozen in place. Thus, what might have been adequate ninety years ago may not necessarily be adequate today. As time passes, the religious needs of an institution can grow so large that the impinging nature of zoning laws may become much more burdensome. Similarly, the construction of the parish center at another location, as Plaintiffs suggest, would not avoid the bylaw's substantial burden on religious exercise at St. Ann's present location. *See Saints Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895, 901 (7th Cir.2005) (holding that city had created a substantial burden by requiring church to "search[ ] around for other parcels of land" rather than rezoning property church already owned).

In the end, there is sufficient evidence in the court record to conclude, as had the ZBA, that the denial of a permit to build the parish center would substantially burden religious exercise at St. Ann's. In effect, the types of religious exercises that would take place in the parish center would be substantially compromised were section 9.18 of the bylaw and its related provisions imposed on the diocese. Accordingly, and perhaps most importantly, the ZBA's decision, on the issue of substantial burden, was clearly not "based on a legally untenable ground," nor was it "unreasonable, whimsical, capricious or arbitrary."

### c. *Is the Bylaw the Least Restrictive Means of Furthering a Compelling Government Interest?*

█ Plaintiffs next argue that even if the bylaw substantially burdened religious exercise, it was the least restrictive means of furthering a compelling government interest. *See* 42 U.S.C. § 2000cc(a)(1) (land use regulation can place substantial burden on the exercise of religion only if it "(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest"). Assuming the burden of proof on this point, Plaintiffs contend that the setback, density and parking requirements of section 9.18 and its related provisions reflect compelling governmental interests and that, in any event, the diocese was not being treated worse than other places of assembly. For its part, the diocese asserts that there is no compelling state interest to justify the burdens imposed by the setback and density (as distinct from the parking) requirements, that the ZBA made claim to no such interest and that, in any event, there are other, less restrictive means of furthering the town's interests, means which the ZBA in fact employed. Again, the court finds that the diocese has the better argument, particularly when considering the deferential standard of review which this court must apply.

### (i) *Compelling Government Interest*

As is true with the term "substantial burden," RLUIPA does not define "compelling governmental interest." Its legislative history, however, "indicates the phrase was taken directly from [RFRA], and 'was and is intended to codify the traditional compelling interest test.' " *Elsinore Christian Ctr.,* 291 F.Supp.2d at 1091 (quoting Statement of Rep. Charles T. Canady, RLUIPA sponsor, 146 Cong. Rec. E 1563 (2000)). One of RFRA's stated purposes was "to restore the compelling interest test as set forth in *Sherbert* ... and ... *Yoder.*" 42 U.S.C. § 2000bb(b). In *Sherbert,* the Supreme Court considered South Carolina's denial of unemployment benefits to a Seventh Day Adventist

who, in conformity with her religion's Sabbatarian beliefs, refused to work on Saturdays. *Id.,* 374 U.S. at 400, 83 S.Ct. 1790. The Court concluded that the scheme effected a burden on the adherent's religious exercise and that any interest in avoiding abuse of or fraud on the unemployment system did not represent a "compelling state interest." *Id.* at 405–09, 83 S.Ct. 1790. "[I]n this highly sensitive constitutional area," the Court noted, "only the gravest abuses, endangering paramount interest, give occasion for permissible limitation." *Id.* at 406, 83 S.Ct. 1790 (citation and internal quotation marks omitted). Similarly, in *Yoder,* the Court held that Wisconsin's interest in an educated citizenry was not sufficient to warrant impinging upon Amish and Mennonite beliefs that militate against formal education after the eighth grade. *Id.,* 406 U.S. at 234–35, 92 S.Ct. 1526. The Court observed that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215, 92 S.Ct. 1526. *See also Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal,* —— U.S. ——, 126 S.Ct. 1211, 1213–14, 163 L.Ed.2d 1017 (2006) (discussing *Sherbert* and *Yoder* ).

In the instant case, Plaintiffs are not particularly clear what "compelling government interest" they believe is served by the bylaw. The town, for its part, claims none. At best, Plaintiffs assert that Dubendorf, in his opinion letter to May, failed to examine the other uses permitted at the site which would have—in Dubendorf's words—"arguably, equal or greater impacts on the protected interest," *i.e.,* adverse traffic and increased activities at the site. (Def.'s Ex. 3(E) at 3.) Had Dubendorf performed a more thorough analysis, Plaintiffs argue, he would concluded that the special permit, site plan and additional zoning requirements necessary for other uses, *e.g.,* museums and libraries, are far

more restrictive than the favorable regulations set forth in section 9.18. Therefore, Plaintiffs assert, the contention that section 9.18 cannot further a compelling interest is simply wrong.

As is obvious, Plaintiffs again target Dubendorf's advisory opinion rather than the ZBA which considered and decided all the central issues. In essence, the ZBA determined that there was no compelling town interest in imposing either the 200–foot setback requirement or the four percent building lot coverage requirement for religious institutions. Plaintiffs have not convinced the court otherwise.

Like the ZBA, the court believes that the setback and coverage requirements reveal no particularly compelling interest. As the diocese points out, these restrictions, in combination, are more stringent than any others applied in the town's residential, commercial and industrial areas. Under section 8.4 of the bylaw, for example, maximum building coverage for all districts range from ten percent (in one residential district) to twenty percent (in the other residential and commercial districts) to thirty-five percent (in the industrial district). To be sure, the harsher four percent coverage for religious uses applies to educational institutions as well, but the court sees no reason why religious and educational institutions necessarily fall within the same class and, in any event, the educational institution requirement is not before the court. Moreover, in contrast to a five percent coverage requirement for planned unit offices or research centers—which applies in residential areas only and to a minimum lot size of fifteen acres (see bylaw § 9.14.1)—the four percent coverage for religious institutions applies without reference to lot size. And while other zones may have similar set back requirements, none have the particu-

lar restrictive combinations applied by section 9.18 to religious institutions.

Finally, it should be noted that May and the ZBA did impose restrictions on the building permit to address yet other town interests, parking and congestion. Prior to RLUIPA, of course, such traffic concerns were not universally considered compelling. *See, e.g., Love Church v. City of Evanston,* 671 F.Supp. 515, 519 (N.D.Ill. 1987) ("While traffic concerns [generated by a church] are legitimate, we could hardly call them compelling."). Yet even assuming that such concerns are compelling under RLUIPA, as Plaintiffs maintain, the ZBA, in the court's opinion and as described below, furthered those interests in "the least restrictive means" as required by 42 U.S.C. § 2000cc(a)(1)(B).

### (ii) *Least Restrictive Means*

As indicated, the only compelling governmental interests that Plaintiffs have articulated are, arguably, the town's parking and traffic congestion concerns. With regard to congestion, Plaintiffs assert that St. Ann's Avenue is often blocked with cars and pedestrians as parishioners arrive and leave. Certain plaintiffs also point to illegally parked cars, particularly during significant church events. As described, however, the ZBA approved a condition imposed by May that the parish center and church not operate at the same time. In the court's opinion, this condition addressed Plaintiffs' concerns about congestion in an appropriate, non-restrictive manner.

As for parking concerns, both sections 9.18 and 10 of the bylaw require one parking space for every three seats for "places of assembly." St. Ann's sanctuary currently has 600 seats and only 44 parking spaces, but St. Ann's preexisted the parking requirements and, accordingly, was not

in violation. Plaintiffs nonetheless assert that the 150 seat parish center, when added to the sanctuary's seating capacity, would violate the 1:3 parking requirements. Therefore, Plaintiffs argue, the diocese needs to seek a variance on this issue.

The court disagrees. First, as indicated, one condition of the permit is that the parish center and sanctuary not operate at the same time. Thus, it was well within the ZBA's power to apply the 1:3 parking ratio to the parish center alone, rather than in combination with the grandfathered sanctuary. Second, the ZBA further required as a condition of the building permit that St. Ann's add fifty *more* parking spaces on site, thereby independently fulfilling the 1:3 requirement for the parish center and, as a result, providing additional spaces when the sanctuary alone was in use. Accordingly, there was no section 9.18 or 10 violation—or any obligation for the diocese to seek a variance—and such allegations in Plaintiffs' complaint (see, *e.g.,* Counts I and II) fall of their own weight.

To be clear, the court is concerned that the precise location of the additional parking on the property could run afoul of the bylaw. As the court understands matters, the additional parking was added as a condition by the ZBA after the conclusion of the hearings without the abutters having had an opportunity to comment on its location or design. (See Pls.' Ex. F (Affidavit of James Biancolo) ¶ 7.) The court, therefore, expects that the town will ensure that the location of the additional parking will conform to its bylaw. The court also fully expects that the town will not turn a blind eye to on-street parking violations and will enforce all such regulations as well.[4]

4. One additional point with regard to Count

Four and Plaintiffs' invocation of section 5.5

At bottom, the ZBA was on solid footing when it concluded that the bylaw was not the least restrictive means of furthering a compelling government interest. Moreover, the ZBA's decision certainly was not "based on a legally untenable ground" nor was it "unreasonable, whimsical, capricious or arbitrary." Accordingly, the diocese's motion with respect to the bylaw counts will be allowed.

### 5. Remaining Arguments With Respect to Counts V and VI

Plaintiffs raise two additional issues in the context of Counts V and VI which, if decided in Plaintiffs' favor, could require further review by the ZBA. For the reasons which follow, the court concludes that the diocese has the stronger argument on these issues as well.

#### a. Remand to ZBA

Plaintiffs first argue that if any part of the bylaw is unenforceable under RLUIPA, the diocese's building permit should be remanded to the ZBA in order to determine the extent to which the remaining bylaw provisions should apply to the proposed parish center. For example, Plaintiffs assert, it is possible that certain parts of the bylaw—such as the parking regulations—could be held valid under RLUIPA, while other parts might be found invalid. At the very least, Plaintiffs imply that the issues could be resolved by having the diocese seek a special permit or variance.

Unfortunately for Plaintiffs' cause, the one example offered by them is insufficient as a matter of both fact and law and their remaining argument is too vague to be of much assistance. First, the parking regulations invoked by Plaintiffs remain in effect. The diocese's target was only so much of section 9.18 as concerned building coverage and setback. The parking regulations themselves were not challenged. Nor was section 10 of the bylaw which also governs off-street parking.

Second, requiring the diocese to apply for a special permit or variance, as Plaintiffs suggest, would be an empty exercise. Indeed, in many ways, Plaintiffs' argument harkens back to the letter submitted by their counsel to the ZBA prior to the first hearing. Plaintiffs' counsel asserted therein that the matter before the ZBA should proceed in two stages. The ZBA, he argued, must first determine whether or not it was proper for May to have issued the building permit on the opinion of special town counsel. "Should the ZBA determine that the building permit was issued in error and that a special permit and/or variance is required," Plaintiffs' counsel continued, "we believe the procedure would be for [St. Ann's] to make the requisite application and have the legal notices filed." (Complaint, Ex. H.) The second stage of the hearings, counsel added, would involve the ZBA's consideration of St. Ann's application for a special permit or variance. (See *id.*)

As is obvious, Plaintiffs' counsel did not allow for the possibility that the ZBA would reject his analysis and, instead, treat the matter as an abutters' appeal of the building permit issued by May, thereby exempting St. Ann's from applying for a special permit or variance. As the diocese notes, the town had the option, albeit

---

of the bylaw (which requires a special permit for "any extension, alteration or reconstruction of a non-conforming structure"): Plaintiffs' arguments to the contrary, the ZBA did not have to deal with section 5.5 since the so-called "non-conforming structure," *i.e.*, the sanctuary, was not being "exten[ded], al-

ter[ed] or reconstruct[ed]." During the series of public hearings, the diocese eliminated a "Cloister" from plans which otherwise would have connected the parish hall to the preexisting structure. (See Def.'s Ex. 3(A) ¶ 22.) As a result, the request for a building permit concerned new construction only.

not an obligation, under RLUIPA to refuse to enforce so much of the offending bylaw as placed a substantial burden on St. Ann's religious practices. *See* 42 U.S.C. § 2000cc–3(e) ("A government *may* avoid the preemptive force of any provision of this chapter by changing the policy or practice that results in a substantial burden on religious exercise, by retaining the policy or practice and exempting the substantially burdened religious exercise, by providing exemptions from the policy or practice for applications that substantially burden religious exercise, or by any other means that eliminates the substantial burden.") (emphasis added). This is exactly what the town chose to do.

Granted, as Plaintiffs point out, the procedure utilized by the ZBA may have shifted the burden between the parties. As it stood, Plaintiffs, as abutters challenging the permit issued by May, had to obtain four of the five ZBA votes to have the permit revoked. Had St. Ann's instead been required to seek a permit from the ZBA, four of five votes would have been necessary in its favor. In any event, the vote was five to zero in favor of the building permit, and the court finds no evidence in the record to believe that shifting the burden would have made any difference.

More to the point, the standards for reviewing zoning decisions demonstrate the deficiency of Plaintiffs' argument. First, "the board's decision is the point of departure for the court's review." *Britton v. Zoning Bd. of Appeals of Gloucester*, 59 Mass.App.Ct. 68, 794 N.E.2d 1198, 1202 (2003) (citation omitted). Second, "the court must find the facts *de novo* and give no weight to those the board has found." *Id.* (citing, *inter alia*, Mass. Gen. L. ch. 40A, § 17; *Pendergast v. Bd. of Appeals of Barnstable*, 331 Mass. 555, 120 N.E.2d 916, 919 (1954)). Finally as described, the court, to set aside the ZBA's decision,

must find that the decision was "based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon*, 255 N.E.2d. at 350. That hurdle has not been surmounted here. *See also Hagopian v. Salafia*, 2005 WL 1324765, at *4 (Mass.Land Ct. June 6, 2005) (while there may be some differences between the review of a *grant* of a permit and its *denial*, "the theme of deference to the board's reasonable judgments is common to both") (citing *Garvey v. Bd. of Appeals of Amherst*, 9 Mass.App.Ct. 856, 400 N.E.2d 880 (1980)).

b. *Section 3 and RLUIPA Preemption*

Plaintiffs also point to section 3 of chapter 40A, a Massachusetts zoning statute which existed prior to RLUIPA and question whether that statute should be preempted by the federal law. This statute—referred to by the parties as the "Dover Amendment" because it traces its roots to *Attorney Gen. v. Dover*, 327 Mass. 601, 100 N.E.2d 1 (1951)—provides in applicable part that "[n]o zoning ordinance or by-law shall ... prohibit, regulate or restrict the use of land or structures for religious purposes ...; provided, however, that such land or structures may be subject to reasonable regulations concerning the bulk and height of structures and determining yard sizes, lot area, setbacks, open space, parking and building coverage requirements." Mass. Gen. L. ch. 40A, § 3. RLUIPA, in turn, provides that nothing therein "shall be construed to preempt State law ... that is equally as protective of religious exercise as, or more protective of religious exercise than" RLUIPA itself. 42 U.S.C. § 2000cc–3(h).

Plaintiffs argue that RLUIPA does not preempt the Dover Amendment since it is arguably more protective of religious institutions than the federal statute. And unlike RLUIPA, Plaintiffs assert, the Dover Amendment has a solid body of case law to

provide the ZBA with guidance in its application. Accordingly, Plaintiffs argue, this court should avoid unnecessarily preempting the existing statutory scheme and apply the Dover Amendment in the first instance. Had that been done by the ZBA, Plaintiffs conclude, it would have been evident that May exceeded his authority in granting a blanket exemption from the bylaw without an appropriate showing on St. Ann's part, particularly with respect to the parking provisions.

While creative, Plaintiffs' argument is not convincing. First, as the diocese argues, it is not at all clear that the Dover Amendment is more protective of religious institutions than RLUIPA. To be sure, the Dover Amendment provides that a zoning ordinance cannot prohibit the *use* of land or structures for religious purposes. However, it also provides that such land or structures may be subject to "reasonable regulations" concerning lot area, setbacks, parking and building coverage, among other items. In short, the Dover Amendment appears to provide nowhere near the kind of protection afforded by RLUIPA which, as indicated, prohibits land use regulations that impose a "substantial burden" on religious exercise.

Second, even were the court to accept Plaintiffs' comparison of the Dover Amendment to RLUIPA, there is hardly a difference that would matter here. In Plaintiffs' view, for example, the Dover Amendment—which has been held constitutional by the First Circuit *see Boyajian v. Gatzunis,* 212 F.3d 1, 2–3 (1st Cir. 2000)—provides a balancing test analogous to 42 U.S.C. § 2000cc(a). And like RLUIPA, Plaintiffs assert, the Dover Amendment can invalidate even a neutral zoning ordinance where it substantially burdens the use permitted an institution. *See Trustees of Tufts College v. City of Medford,* 415 Mass. 753, 616 N.E.2d 433, 437–

38 (1993) ("The whole of the Dover Amendment, as it presently stands, seeks to strike a balance between preventing local discrimination against [a religious] use and honoring legitimate municipal concerns that typically find expression in local zoning laws.") (citation omitted). Thus, even were Plaintiffs' analysis accurate, it is doubtful that the ZBA would have acted in any different a manner had it approached the issue via the Dover Amendment instead of RLUIPA. *See also id.* at 438 (observing that reasonableness under the Dover Amendment depends on the particular facts of each case).

Third, Plaintiffs' Dover Amendment argument is simply another attempt to overturn May's issuance of the building permit as if there had been no review of his decision by the ZBA. For all the reasons mentioned, however, the very issues which Plaintiffs wish to raise again before the ZBA, except perhaps for the exact location of on-site parking, have been addressed by the ZBA and, now, by this court.

As it turns out, the *Trustees of Tufts College* decision cited by Plaintiffs is particularly instructive with regard to their parking concerns, although perhaps not in ways they intend. Some history, however, is in order. Addressing a previous incarnation of the Dover Amendment, the Supreme Judicial Court ("SJC") in *Radcliffe College v. Cambridge,* 350 Mass. 613, 215 N.E.2d 892 (1966), upheld a zoning requirement governing parking at an education institution (another subject of the Dover Amendment). *Id.* at 895–96. The court suggested, however, that future application of the requirement might be deemed unreasonable under the Dover Amendment if it were to require the educational institution to provide more parking space "than could in reason be deemed necessary to take care of the cars brought to the [area] by the use made of it by the

college." *Id.* at 896. As the SJC later noted in *Trustees of Tufts College,* this principle, as well as principles enunciated in *Sisters of Holy Cross v. Brookline,* 347 Mass. 486, 198 N.E.2d 624 (1964), were later incorporated into the Dover Amendment. *Trustees of Tufts College,* 616 N.E.2d at 438 n. 6. *See also The Bible Speaks v. Board of Appeals of Lenox,* 8 Mass.App.Ct. 19, 391 N.E.2d 279, 283 n. 10 (1979) (discussing history of Dover Amendment). The SJC concluded that the town's parking requirements were reasonable as applied to the Tufts campus. *Trustees of Tufts College,* 616 N.E.2d at 440. "Parking, as it affects physical conditions on and around an educational use," the court explained, "is a legitimate municipal concern and a proper subject of local zoning regulation." *Id.*

Here, in contrast, the diocese does not contest the town's application of its parking regulations to the site and has accepted the conditions imposed by the ZBA upon the building permit. Accordingly, as previously described, the diocese is not seeking to exempt itself under RLUIPA (or, assumedly, the Dover Amendment) from the town's parking requirements.

*Trustees of Tufts College* is noteworthy in at least one other respect, namely, its explanation that "a court may consider a municipality's concession, . . . in the course of litigation, that a particular requirement of its zoning law is unreasonable as applied to a proposed educational use." *Id.* at 439. The same, no doubt, can be said with regard to concessions regarding "religious" uses since the Dover Amendment applies both to educational and religious uses. The "concession" made by the municipality in *Trustees of Tufts College* was to permit the college to treat the core area

of its campus, despite the many buildings thereon, as a single lot for purposes of the parking ordinance. *See id.* at 439–40, 616 N.E.2d 433. This concession had a significant effect on the outcome of the case in that it eliminated more stringent parking requirements for individual campus buildings. *See id.*

While there is no such mid-litigation concession in the case at bar, it is significant, as described, that the ZBA ultimately agreed with the diocese's position and found, after hearings, that the bylaw, particularly the setback and lot coverage requirements, violated RLUIPA. The town does not seek to take a different position in this appeal. Of course, the ZBA's findings are not binding upon this court. Nonetheless, they have been taken into account as permitted by *Trustees of Tufts College* and in accordance with the standards of review. Moreover, as described, the court has concluded independently that the setback and land coverage requirements violate RLUIPA, if not the Dover Amendment as well. Accordingly, as with the bylaw counts, the diocese's motion with respect to the remainder of Counts V and VI will be allowed.[5]

#### 6. *Historic Commission (Count VIII)*

Finally, there appears to be no basis for Count Eight, which seeks to have the court refer the matter to the Historic Commission. Plaintiffs admit in their complaint that the proposed parish center will lie outside the historic district, even though the majority of the church buildings will continue to be within that district. Accordingly, the diocese's motion with respect to Count Eight will be allowed.

---

**5.** The court has reached this conclusion without even considering the diocese's alternative arguments that the bylaw violated RLUIPA's "equal terms," "nondiscriminatory" and "unreasonably limits" provisions. *See* 42 U.S.C. § 2000cc(b).

### 7. *Summary*

For the reasons described, the court believes that the diocese's motion for summary judgment ought to be allowed with respect to each of the remaining counts. In addition, the diocese's arguments are equally applicable to the ZBA (the proper target of Plaintiffs' appeal) and May (who issued the permit in the first place), both of whom have remained silent.

### B. *PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT*

In reaching the conclusion that the diocese, the ZBA and May are entitled to summary judgment with respect to each of Plaintiffs' remaining claims, the court has reviewed the facts and inferences, pursuant to appropriate summary judgment praxis, in a light most favorable to Plaintiffs. It is, therefore, logically impossible to grant Plaintiffs summary judgment since, in doing so, the facts and inferences would have to be stated less favorably to them and more favorably to Defendants. As a result, Plaintiffs' motion for summary judgment will be denied.

### IV. CONCLUSION

For the reasons stated, the diocese's motion for summary judgment is ALLOWED and Plaintiff's motion for summary judgment is DENIED. Since the diocese's motion for summary judgment applies to the ZBA and May, judgment shall enter in their favor as well and the case may now be closed.

IT IS SO ORDERED.