941 A.2d 560

**TRINITY ASSEMBLY OF GOD OF BALTIMORE CITY, INC.**

**v.**

**PEOPLE'S COUNSEL FOR BALTIMORE COUNTY, et al.**

**No. 2840, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Feb. 6, 2008.

C. William Clark, Towson, for appellant.

Peter M. Zimmerman, People's Counsel for Baltimore County, Towson, for appellee.

Panel DEBORAH S. EYLER, SHARER, and PAUL E. ALPERT, (Ret'd, Specially Assigned), JJ.

EYLER, DEBORAH S., J.

The instant zoning dispute over a sign is approaching its sixth year in litigation. On September 9, 2002, Trinity Assembly of God of Baltimore City, Inc. ("the Church"), the appellant, filed a petition for variance with Baltimore County, seeking to vary the height and square footage limitations for a sign on its property ("Property"). The Deputy Zoning Commissioner took evidence and denied the petition. The Church appealed to the County Board of Appeals ("Board"), which

held a *de novo* evidentiary hearing. It also denied the petition.

In the Circuit Court for Baltimore County, the Church brought an action for judicial review. The People's Counsel for Baltimore County ("the County") appeared as the respondent. The court upheld the final decision of the Board but remanded the matter for the Board to consider the application of 42 U.S.C. section 2000cc, *et seq.*, known as "The Religious Land Use and Institutionalized Persons Act" ("RLUIPA"). The Board did so, and again denied the petition. In a second action for judicial review, the circuit court affirmed the Board's final decision. We have before us now the Church's appeal from the judgment in that action. The County is the appellee in this Court.

The Church raises two questions for review, which we quote:

I. Did the Board fail to apply the correct law of variances as to "uniqueness" and err in its determination that [the Church's] burden was not met?

II. Did the Board err as a matter of law when it found that the proposed use constitutes religious exercise, but compelling interests exist which present no substantial burden on religious exercise? Was the Board's denial of the variances arbitrary and capricious since [the County] failed to support [its] objections with legally sufficient empirical data?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

The Property is comprised of 15 acres of land situated along side the inner loop of the Baltimore Beltway (Interstate 695), in the greater Towson area. Its address is 2122 West Joppa Road. It is in a low-density residential zone in which a church is a permitted use.

The Property is a rectangular parcel that is nestled at the intersection of the Beltway and West Joppa Road, which runs northeast across the Beltway, by overpass. Its westernmost short side is adjacent to the east side of West Joppa Road. Its northernmost long side is adjacent to a portion of the Beltway that is slightly east of Exit 23 (Interstate 83/Pikesville/Falls Road) and west of Exit 24 (Interstate 83). That particular segment of the Beltway actually is both I–695 and I–83. For a vehicle to travel from I–83 North inside the Beltway (the Jones Falls Expressway) to I–83 North outside the Beltway (Harrisburg Pike), the driver must traverse the eastbound segment of I–695 of which we speak.

Another church is located immediately across West Joppa Road from the Property; and yet a third church is located directly across the Beltway, also on the east side of West Joppa Road. There is a country club (also a permitted use in the zone) catty-corner to the Property, across the Beltway.

The Church currently has two signs visible from a highway. One is an identification sign measuring 36 square feet located at the Church's entryway on Joppa Road. The second is a double-sided sign that was erected when the original primary building was constructed in 1980; its replacement is the subject of this appeal. It is situated at the northwest corner of the Property, facing west, toward oncoming traffic on the inner loop, which at that point in the Beltway is roughly eastbound. Much of the Property's border with the Beltway is walled off by 20– to 25–feet–high sound barriers that were erected by the County in the 1990s. The sound barriers end just to the east of the sign. The sign is made of wood, is 6 feet high by 4 feet wide, and is mounted on two 6 inch by 6 inch treated lumber supports. It identifies the Church as "Trinity" in large letters and "Assembly of God" in smaller letters. At night, the sign is illuminated by a ground-mounted light fixture.

Because of the configuration of the Beltway and the West Joppa Road overpass, a sign at that location only can be seen by travelers on the inner loop. Also, a sign at that location

does not have directional value, *i.e.*, its location is not close enough to a Beltway exit from which the Church can be accessed to direct Beltway travelers to its site.

In its petition, the Church sought a variance from Baltimore County Zoning Regulation ("BCZR") section 450.4 Table of Sign Regulations ("450.4 Table"), to permit a single-faced, freestanding, illuminated identification sign of 250 square feet in area, *in lieu* of the allowed 25 square feet, and 25 feet in height, *in lieu* of the allowed 6 feet, with part of the sign being "changeable copy," operated electronically. The changeable copy segment of the proposed sign is designed to be in the middle area of the sign, approximately 5 feet high and 18½ feet wide.

The evidentiary hearing before the Deputy Zoning Commissioner took place on October 15, 2002. Witnesses in support of the petition were George Raduano, the pastor of the Church; Ellis Shapos and Robert Weaber, representatives of Visual Message and Display, Inc., the designer of the new sign; and counsel for the Church. Appearing in opposition to the petition were several residents of the surrounding community and Peggy Squitieri, a representative of the Ruxton/Riderwood/Lake Roland Area Improvement Association.

The Deputy Zoning Commissioner issued his memorandum opinion and order denying the variance request on October 23, 2002. He found as follows:

> After considering the testimony and the evidence offered both in support and in opposition to the [Church's] request, I find that the variance request to permit the sign in question to be constructed on the [Church's] property should be denied. Of particular concern to me was the flashing message portion of the sign in question. The testimony offered at the hearing did demonstrate that the old sign is out-dated and is in need of replacement. However, the sign proposed to replace the old sign is not appropriate and cannot be approved.

The Church appealed to the Board, which, on July 17 and 29, and December 10, 2003, held a public evidentiary hearing.

Appearing in favor of the requested variance were: 1) Pastor Raduano, who testified that the Church intended to use the proposed sign to post directions, community activities, scripture verse and other inspiring messages; 2) Mr. Shapos; 3) Dr. Robert James Claus, who was accepted as an expert witness on signs and the sign industry; and 4) William Monk, who was accepted as an expert in the Baltimore County zoning and development regulations. Appearing in opposition were 1) Jeffrey Long, of the Baltimore County Planning Office, who was accepted as an expert in planning; 2) George Jensen, a resident of the general area of the Church; 3) Patricia Huffman, president of the Heatherfield Community Association; 4) Ms. Squitieri; 5) Randall Scott, an Assistant District Engineer for Traffic for the State Highway Administration ("SHA"), who testified among other things about concerns the SHA had about the erection of a blinking and flashing sign at that portion of the Beltway; 6) Jack Dillon, an expert in planning and zoning; and 7) Donald Gerding, a representative of the Greater Timonium Community Council. Numerous documents were admitted into evidence.

On July 2, 2004, the Board issued a 34–page opinion denying the petition for variance. The Board devoted 22 pages of its opinion to background and context information and summaries of the testimony of each witness. The Board then described the question before it:

It is to be noted that the proposed sign is for an institution [a church] which is permitted as a matter of right in the [Density Residential 2] zone. The only question is one of the present height limitations of 6 feet and an area limitation of 25 sq. ft. The Board is required to apply the law of variances as prescribed by Baltimore County Zoning Regulations (BCZR) § 307.1. That legislation requires the Board to grant variances from "height and area regulations, and from sign regulations only in cases where special circumstances exist that are peculiar to the land or structure which is the subject of the variance request, where strict compliance with the zoning regulations would result in practical difficulty or unreasonable hardship ... and any such vari-

ances shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking, or sign regulations, and only in such manner as to grant relief without injury to the public health, safety and welfare."

The Board proceeded to discuss the particulars of the issue before it and to conclude: 1) the Property is not "unique" within the meaning of that term as explained in the relevant zoning case law; 2) alternatively, there is no "practical difficulty" with respect to the Property; 3) the BCZR sign ordinance is not unconstitutional; and 4) the Board did not have jurisdiction to decide "the issue of whether or not [RLUIPA] applies to the instant case" because "it is not within [the Board's] jurisdiction to rule on the applicability of Federal statutes."

The Church filed its action for judicial review on July 22, 2004. The parties submitted memoranda of law and appeared before the court for oral argument.

On May 31, 2005, the court issued a "Judgment and Order" determining that the Board's factual findings that the Property was not "unique" and did not present "practical difficulties" were supported by substantial evidence in the agency record; and that the Board properly found, as a matter of law, that the section of the BCZR governing signs "do[es] not offend the freedom of speech, the freedom of exercise of religion, or freedom of assembly, guaranteed by the Constitution of the United States and the Maryland Declaration of Rights." The court decided, however, that it was within the power of the Board to consider and decide "the effect [RLUIPA] might have on the [Church's] request for a sign variance[,]" and remanded the matter to the Board for that purpose.

On remand, the Board heard oral argument from counsel representing the parties and conducted a public deliberation. On October 8, 2006, the Board issued its opinion on remand and found that the denial of a variance did not work a substantial burden on the Church's religious exercise, and, as such, did not violate RLUIPA in the enforcement of the County's sign regulations. Alternatively, the Board found that denying the Church's variance request was the least

restrictive means available to further the County's compelling interest in traffic safety and community aesthetics as reflected in the County's sign regulations. Accordingly, the Board again denied the variance petition.

The Church brought a second action for judicial review and the parties submitted memoranda and made oral arguments as before. On January 23, 2007, the court issued a "Ruling and Order" affirming the decision of the Board. The court stated:

> [T]he record of proceedings before the [Board] contains substantial evidence in the agency record to support the Board's finding that "Baltimore County 'demonstrated a compelling interest in the passage of the sign ordinance which would reduce the number of distractions to motorists on the county's roads and highways and would reduce the clutter and excessive incompatible signage which had appeared throughout the County' ... [and] 'that the passage of the sign regulation in Baltimore County'" ... "'is the least restrictive means of furthering that compelling government interest'.... Accordingly, the [Board] was correct in concluding that the denial of [the Church's] application for a sign variance was not a violation of [RLUIPA]."

The Church noted a timely appeal to this Court. We shall include additional information as necessary to our discussion of the issues.

## DISCUSSION

### I.

The zoning regulations governing signs in Baltimore County can be found at BCZR section 450, *et seq.* By means of definitions and a table of regulations, that section controls the type, nature, size, and number of signs that may be erected on properties in Baltimore County. Two classes of sign are relevant to the case at bar: 1) "Changeable Copy," which "mean[s] an on-premises sign displaying a message which may be changed periodically, manually, or by electric or electronic controls[,]" and 2) "Identification," which "mean[s] a sign

displaying the name or purpose of a place or structure." BCZR 450.4 Table.

One changeable copy sign is allowed as an accessory to an "institutional structure," which pursuant to section 450.3 includes a church. Such a sign may be wall-mounted or free-standing, may be illuminated, and may not exceed 25 square feet in area and 6 feet in height. It requires a use permit. BCZR 450.4 Table. Identification signs—one for each frontage of the property—also are allowed as an accessory to a church. They may be wall-mounted or freestanding, may be illuminated, may not exceed 25 square feet in area and 6 feet in height. They also require a use permit.

The authority to grant variances from zoning regulations, including from sign regulations, is conferred upon the Zoning Commissioner and the Board pursuant to BCZR 307.1. As pertinent to the issues in the case at bar, that regulation provides that,

> the power to grant variances from height and area regulations, from off-street parking regulations, *and from sign regulations [exists] only in cases where special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request and where strict compliance with the [BCZR] would result in practical difficulty or unreasonable hardship....* [A]ny such variance shall be granted only if in strict harmony with the spirit and intent of said height, area, off-street parking or sign regulations, and only in such manner as to grant relief without injury to the public health, safety and general welfare.

BCZR 307.1 (emphasis added).

In *Cromwell v. Ward,* 102 Md.App. 691, 651 A.2d 424 (1995), Judge Cathell, then a member of this Court, explained that the variance authority conferred by BCZR 307.1, like the variance authority conferred upon non-charter counties by Article 66B of the Maryland Code, implicates two issues: uniqueness and practical difficulty. *Id.* at 694–96, 651 A.2d 424. Specifically, the requirement that variances be granted

only when "special circumstances or conditions exist that are peculiar to the land or structure which is the subject of the variance request" is a uniqueness criterion that must be satisfied—even though the word "unique" is not used; and if that first criterion is met, practical difficulty or unreasonable hardship also must be shown. *Id.* at 698–99, 651 A.2d 424. With respect to uniqueness, Judge Cathell further explained:

> [T]he initial factor that must be established before the practical difficulties, if any, are addressed, is the abnormal impact the ordinance has on a specific piece of property because of the peculiarity and uniqueness of *that* piece of property, not the uniqueness or peculiarity of the practical difficulties alleged to exist.

*Id.* (emphasis in original). *See also Mueller v. People's Counsel for Baltimore County,* 177 Md.App. 43, 70, 934 A.2d 974 (2007) (stating that the uniqueness factor for obtaining a variance "requires a finding that the property whereon structures are to be placed (or uses conducted) is—in and of itself—unique and unusual in a manner different from the nature of surrounding properties such that the uniqueness and peculiarity of the subject property causes the zoning provision to impact disproportionately upon that property.") (quoting *Cromwell, supra,* 102 Md.App. at 694–95, 651 A.2d 424).

In the case at bar, the Board found, in its initial opinion, that the Church did not satisfy the uniqueness criterion and on that ground alone would not be granted the requested variance from the height and area requirements of the sign regulations. The Board explained as follows:

> The first requirement [for a variance] obviously imposed on the Board is to determine whether or not, as a finder of fact, uniqueness is present as to the land or structure. The "uniqueness" requires that "the subject property have an inherent characteristic not shared by other properties in the area." The Board as the finder of fact has no difficulty determining, from the testimony and the evidence submitted, that the subject property is not "unique" within the guidelines of *Cromwell.*

Unlike many variance request cases that come before the Board where very little is known about the subject property in question by the Board members, this case is unusual because all three panel members have considerable knowledge of the location of the [C]hurch, and that portion of the eastbound Baltimore Beltway that intersects with I–83, the Harrisburg Expressway. To that extent, Maryland law permits the Board members to bring into focus their own experiences with the roadway system and driving observations in the area.

All three member [sic] of this panel have viewed the sanctuary during daylight hours in the locale of the sound barriers and architectural style of the roof, and are aware of the dangers inherent in "weaving" and "merging" attempts in the area of the [C]hurch. All agree that motorists must be alert and cautious driving in the area and that the height and area face of the proposed sign would be a dangerous distraction to motorists driving eastbound in the direction of northbound I–83.

Irrespective of that factor is the overwhelming weight of evidence and testimony of participants in the hearing. The Board points significantly to the testimony of Mr. Jeffrey Long, who was accepted as an "expert planner." He adequately described the predominantly residential use of the neighborhood. As a planner familiar with the area, he did not consider the subject property to be unique. Other churches in the immediate area of Trinity also had identification problems, since their facilities are only partially visible from the Beltway—or not visible at all but were not requesting additional signage as evidence in this case. The Board credits Mr. Long's testimony.

The [C]hurch occupies approximately 15 acres with the original buildings constructed around 1980. The existing sanctuary was built around 1994, which is the building farthest from [West] Joppa Road. At the time the sound barrier was being constructed, the [Church] was able to work out an agreement with the State Highway Administration to provide a "break" in the barrier wall to provide a

view of the [C]hurch from eastbound I–695. The fact that the church is located adjacent to the Beltway does not make it "unique," since, as Mr. Long opined, "there are many other uses with double frontage to their properties, and in no way unique given its topography." Based on his experience as an area planner, Mr. Long did not believe it had any topographical or geographical characteristics that would make it unique.

There exists many miles of similar type sound barriers along the many miles of the Beltway, along with brush, shrubbery or tree plantings by the SHA to provide visual relief from the driving experience. In other words, being adjacent to the Beltway does not, in and of itself, constitute uniqueness. The testimony of the Protestants herein also could not confirm any uniqueness of the property.

The testimony of Pastor Raduano did not reflect any particular uniqueness to the property, but rather dealt with the [C]hurch's position relative to a need for large signage as opposed to conditions constituting "uniqueness." In fact, the Pastor acknowledged that, while he resided in Eldersburg, and drove the Beltway on a weekly basis, he "could not recall a single institution along the Beltway that had a digital sign of the size or nature that was being proposed." Similarly, Mr. Ellis Shapos, the designer of the proposed sign, in his testimony . . . does not specifically reference the question of "uniqueness"—but rather concentrated on the need for the signage as an identification factor.

Dr. Claus was accepted as an expert in signage and traffic safety. His testimony focused on traffic and safety issues. He admitted that he had only spent "probably five hours in preparing the case, other than travel," hardly sufficient time to consider all local aspects of the case. There is nothing tangible in his testimony concerning any unique aspects of the subject property.

\* \* \* \* \* \*

Frankly, the Board was not impressed with the testimony of [Dr. Claus]. [He] dealt in generalities and not specifics.

\* \* \* \* \* \*

The Board was also not totally impressed with Mr. Monk's analysis of why he considered the property unique. His analysis was that there were "several unique site considerations here, some of which did not exist at the first variance hearing years ago, which created a unique set of circumstances which drove, in part, the positioning, the size, and the height of the subject sign. . . . "

The Board in its analysis of the case and examination of the drawings does not consider that the bushes, the chain fence, the evergreens[,] or the barrier wall create "uniqueness" that are [sic] commonly found in many areas of the Beltway. . . .

In summary, as to the uniqueness issue, the burden is on [the Church] to prove that fact by the evidence and testimony presented at the hearings. The Board concludes that the [Church] has failed to meet its burden and the requested variance must be denied on the basis of that fact alone.

(Citations to the record omitted.)

In this appeal, the Church contends that "the Board failed to apply the correct law of variances as to 'uniqueness' " and that, if the Board did not so err, it nevertheless erred in ruling as a matter of fact that the Church did not meet its burden to show "uniqueness" of the Property. As we shall explain, we disagree with both prongs of this contention.

On the question whether the Board applied the correct variance law as to "uniqueness," the Church argues as follows:

While the Board addressed whether there was uniqueness present as to the land or structure, it failed to correctly state the law as to the definition of uniqueness. The Board defined "uniqueness" as "special circumstances that exist that are peculiar to the land or structure," but omitted the second part of the definition, which focuses on the disproportionate impact that the zoning provision has on the property.

In *Umerley v. People's Counsel,* 108 Md.App. 497, 506, 672 A.2d 173 (1996), this Court wrote:

"A variance may only be granted after a two-step inquiry. First the zoning authority must determine whether the subject property is unique and unusual in a manner different from the nature of the surrounding properties such that the *uniqueness or peculiarity of the property causes the zoning provision to have a disproportionate impact on the property." Cromwell v. Ward,* [*supra,* 102 Md.App. at 721, 651 A.2d 424]. If such a finding is made the zoning authority must then determine whether an unreasonable hardship results from the disproportionate impact of the ordinance....

Brief of Church at 10 (emphasis in Brief). Thus, the Church maintains, on the authority of *Umerley, supra,* that "uniqueness" in variance law requires proof *not only* that the subject property is unusual in a manner different from the nature of the surrounding properties *but also* that the uniqueness causes the zoning regulation sought to be varied to disproportionately affect the subject property; but that the Board in this case overlooked the latter part of the uniqueness definition.

The Board did not misperceive the meaning of the uniqueness concept embodied in BCZR section 307.1. First, the *Umerley* case, decided by this Court less than a year after *Cromwell v. Ward,* did not establish a new or expanded definition of uniqueness. In *Umerley,* owners of property in Baltimore County northeast of Baltimore City, in a light industrial zone, operated it as a trucking facility, even though it did not conform to the zoning regulations for such a facility. In an effort to obtain approval of that use, they petitioned for a special exception and a number of area and use variances. The Zoning Commissioner and then the Board denied their requests, and the Board's decision was affirmed on circuit court judicial review.

This Court likewise affirmed. In doing so, we explained that, to obtain a variance, the applicant must show uniqueness

and practical difficulty. Citing *Cromwell*, we described the uniqueness criterion to mean that "the subject property is unique and unusual in a manner different from the nature of the surrounding properties such that the uniqueness or peculiarity of the property causes the zoning provision to have a disproportionate impact on the property." 108 Md.App. at 50, 670 A.2d 1002 (citing *Cromwell*, *supra*, at 721, 651 A.2d 424). We held that the property's having been used for many years as a trucking facility, contrary to the zoning regulations, did not make it unique for variance purposes.

Second, even if we take the definition of "uniqueness" as explained in *Umerley* to be the most complete and accurate, in that it explains that the uniqueness not only must exist but also must be such as to cause the zoning to have a different impact on the property than on other properties, it is plain that a predicate finding of uniqueness must be made before one inquires whether the uniqueness causes the zoning to have a disparate impact on the property compared to other properties, and here, the Board decided that no predicate finding of uniqueness was proven. Thus, the Board did not misunderstand the legal standard for "uniqueness" in Baltimore County zoning law. It properly understood that its first task in deciding the variance request was to determine whether the subject property is unique; and, as it acknowledged, its finding that the Property is not unique was in and of itself sufficient to deny the variance request.

■ As noted above, the Church also takes issue with the Board's factual finding that the Property is not unique. It argues that the Board "focused solely on the physical attributes of the property, such as the bushes, chain fence, evergreens, and barrier wall," and

ignored whether the interplay of these factors with the practical limitations imposed by the abutting properties, including the Federal Highway Administration and industry standards for signs, and the law protecting land use for religious exercise causes the requirements imposed by the

sign regulations to have disproportionate impact upon the [Church's] property.

■ Our standard of appellate review of an administrative agency's factual findings is highly deferential. We shall uphold any factual finding by the agency for which there is substantial evidence in the agency record—that is, that a reasoning mind reasonably could find from the evidence before it. *See Schwartz v. Maryland Department of Natural Resources,* 385 Md. 534, 554, 870 A.2d 168 (2005) ("The agency's determination of factual issues will be upheld if the record of the agency proceeding affords a substantial basis of fact from which the issue can be reasonably inferred.").

The Board's finding that the Property is not unique is supported by substantial evidence in the record. As noted above, Jeffrey Long, of the Baltimore County Planning Office, was accepted as an expert witness in planning on behalf of the County. He opined that the fact that the Church is located adjacent to the Beltway does not make it unique, in and of itself, as there are miles and miles of properties bordering the Beltway and having similar sound barriers blocking them and making them only partially visible from the Beltway. Moreover, in the Church's neighborhood, there are other churches that either border the Beltway or are partially visible from it (including two in the Church's immediate vicinity). Mr. Long further opined that neither the Property's double frontage nor any of its natural physical features render it unique within the meaning of BCZR section 307.1.

The Board credited Mr. Long's testimony and rejected the testimony of Dr. Claus (who the Board observed offered "nothing tangible ... concerning any unique aspects of the subject [P]roperty") and Mr. Monk (of whom the Board said it was "not totally impressed with [his] analysis of why he considered the [P]roperty unique"). Mr. Long's expert opinions constituted substantial evidence of non-uniqueness to support the Board's finding that the Property was not unique.[1]

---

1. As explained above in our discussion of variance law, to obtain a variance an applicant must show uniqueness *and* practical difficulty.

## II.

On remand from the circuit court, the Board considered whether its denial of the variance request violated section 2000cc of RLUIPA, and concluded that it did not.

RLUIPA provides, in pertinent part:

No government shall impose or implement a land use regulation in a manner that imposes a *substantial burden* on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of furthering that compelling governmental interest. This subsection applies in any case in which . . . the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved.

42 U.S.C. § 2000cc(a)(1), (2)(c) (emphasis added). RLUIPA section 2000cc protects the religious exercise of individuals and institutions from "substantial burden[s]" in the context of land use, while section 2000cc–1 protects the religious exercise of institutionalized persons, using the same "substantial burden" standard.

In its opinion, the Board cited to the Seventh Circuit's discussion of "substantial burden" in *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 760 (7th Cir.2003)

---

The Board here found that neither was shown. The Protestants' first Question Presented appears only to challenge the Board's finding on the uniqueness issue. If their argument in fact were so limited, we would not need to address the issue of uniqueness as we would affirm the denial on the unchallenged practical difficulty issue. The Protestants indeed have challenged the Board's finding of no practical difficulty, however, in their argument for Question I. Accordingly, we have addressed and decided the uniqueness issue; and, having decided in favor of the Board on that issue, we need not address practical difficulty.

*("CLUB"*), *cert. denied,* 541 U.S. 1096, 124 S.Ct. 2816, 159 L.Ed.2d 262 (2004), and proceeded to find as follows:

> [The Church] is not prevented from using [its] property for its permitted purpose nor do such zoning restrictions as to height or area regulations render conformity with such restrictions as unnecessarily burdensome. The position presented by [the Church] is really one of "desire" or "want" rather than one of "need." Lack of such a requested sign does not place anymore[sic] of a substantial burden on [the Church's] exercise of religion than it does on any business to advertise its product.

The Church challenges the Board's decision, arguing that, "[w]hile the Board quoted a passage of law regarding the 'substantial burden' standard, it did not correctly find and apply the appropriate standard as to what constitutes a 'substantial burden' when one is required to change one's religious activity to conform to the requirements of the code." [2] The County responds that the Board correctly defined and applied the "substantial burden" test under RLUIPA.

As stated in section I of this discussion, we defer to an administrative agency's findings of fact but review *de novo* its interpretation of the law. *See Schwartz, supra,* 385 Md. at 554, 870 A.2d at 180 (". . . it is always within our prerogative to determine whether an agency's conclusions of law are correct, and to remedy them if wrong").

 Enacted in 2000, RLUIPA is the successor to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.

---

**2.** The Board also found that, even if the Church had proven that the denial worked a "substantial burden" on its religious exercise, the County established that the variance denial was the least restrictive means of furthering the County's compelling interest in traffic safety and community aesthetics through sign regulation enforcement. The Church objects to this finding as well, arguing that "the Board misconstrued the compelling interest test, incorrectly applied it, and failed to shift the burden to [the County] requiring them [sic] to properly prove a compelling interest for denying the variance." Because of our disposition of the "substantial burden" issue, we need not address the Church's compelling interest/least restrictive means contention.

§ 2000bb *et seq.*, enacted in 1994 and then declared partially unconstitutional. *See City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). RLUIPA is " 'narrower in scope [than RFRA], in that it applies only to governmental actions affecting land use and institutionalized persons, and establishes several jurisdictional limitations not included in RFRA.' " *Mintz v. Roman Catholic Bishop of Springfield,* 424 F.Supp.2d 309, 317 (D.Mass.2006) (quoting *Regulating Historic Religious Properties Under RLUIPA (NTHP Preservation Law Reporter Education Materials,* 2005), SL014 ALI–ABA 719, 722 (Nov.2005). Congress intended, through RLUIPA, to mandate a "more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir.2006) (internal quotation omitted). However, for a court to conduct the strict scrutiny evaluation under RLUIPA of the government decision at issue, "a plaintiff must first demonstrate that the regulation at issue actually imposes a substantial burden on religious exercise." *CLUB,* 342 F.3d at 760; *see* RLUIPA § 2000cc–2(b)).

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." § 2000cc–5(7)(A). Further, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." § 2000cc–5(7)(B). Although First Amendment jurisprudence has limited "religious exercise" to the actual practice of religious beliefs "fundamental" to the person's faith, most judicial interpretations of "religious exercise" as used in RLUIPA have given the term a wider meaning. *See CLUB, supra,* 342 F.3d at 760 (definition of "religious exercise" in RLUIPA's text "reveals Congress's intent to expand the concept of religious exercise contemplated" in First Amendment cases). Various courts have interpreted "religious exercise" to encompass any use of land having some religious purpose, including the construction of parish centers,

religious day schools, and even a socializing hall used for a religiously affiliated group on a college campus. *Mintz, supra,* 424 F.Supp.2d 309 (parish center); *Westchester Day School v. Village of Mamaroneck,* 504 F.3d 338 (2nd Cir.2007) (religious day school); *Episcopal Student Foundation v. City of Ann Arbor,* 341 F.Supp.2d 691 (E.D.Mich.2004) (socializing hall for religious group).

RLUIPA does not define "substantial burden," but a number of federal circuits, including the Fourth Circuit, have articulated generally consistent meanings of the phrase, both in the context of land use regulations (section 2000cc) and institutionalized persons (section 2000cc–1). Addressing a challenge brought under RLUIPA's institutionalized person provision, the Fourth Circuit, noting that the Supreme Court has defined the term "substantial burden" in the context of the Free Exercise Clause, concluded that the meaning of "substantial burden" in RLUIPA is substantially the same: namely, "for RLUIPA purposes, a substantial burden on religious exercise occurs when a state or local government, through act or omission, *'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'"* *Lovelace, supra,* 472 F.3d at 187 (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981)) (emphasis added).[3]

No Maryland appellate court has had occasion to determine the meaning of "substantial burden" or "religious exercise" in the RLUIPA land use context. A number of federal circuit courts have done so, however, and have articulated definitions of "substantial burden" similar to those used in the RLUIPA institutionalized persons context.

---

**3.** Legislative history confirms the Fourth Circuit's assertion that the term "substantial burden" should be interpreted by reference to First Amendment jurisprudence. *See* 146 CONG. REC. 7774–01, 7776 ("The term 'substantial burden' as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the concept of substantial burden or religious exercise").

In *CLUB*, for instance, the Chicago zoning law made churches permitted uses on land zoned residential but special permit uses in other zones. The plaintiff-churches argued that the special use permit requirement combined with the scarcity of affordable, residentially zoned property effectively prohibited them from finding suitable relocation properties in Chicago. The Seventh Circuit defined "substantial burden" under RLUIPA as "one that necessarily bears direct primary, and fundamental responsibility rendering religious exercise— including the use of real property for the purpose thereof within the regulated jurisdiction—effectively impracticable." 342 F.3d at 761. The court concluded that, although the zoning regulations made congregation relocations more difficult and expensive, they did not make it "impracticable" for a church to purchase property for development as a church; in fact, all of the plaintiff-churches had found and developed suitable property within the Chicago city limits, even if those locations were not the most desirable or suitable to the individual congregation's needs. *Id.* at 761–62. *See also Vision Church, United Methodist v. Village of Long Grove,* 468 F.3d 975, 999 (7th Cir.2006) (holding that village's approval of church's special use permit for new sanctuary construction with restrictions on future building and church activity limitations during the week imposed "no more than incidental burdens on the exercise of religion"), *rehearing and rehearing en banc denied,* January 10, 2007, *cert. denied,* —— U.S. ——, 128 S.Ct. 77, 169 L.Ed.2d 243 (2007).

In *Midrash Sephardi, Inc. v. Town of Surfside,* 366 F.3d 1214, 1225–28 (11th Cir.2004), the Eleventh Circuit rejected a RLUIPA challenge by two synagogues to a city zoning ordinance that restricted churches and synagogues to "RD–1" zoned properties. The synagogues argued that their Orthodox Jewish faith required their congregants to walk to weekly services, and that limiting the possible building sites for a new synagogue to the RD–1 zone locations would "greatly burden" many young and elderly congregants who would have difficulty walking from their homes to any available property in the RD–1 zone. The court held that the ordinance did not effect a

"substantial burden" on the plaintiff-synagogues because, to be substantial, a burden

> must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct.

366 F.3d at 1227. The court concluded that, "[w]hile we certainly sympathize with those congregants who endure Floridian heat and humidity to walk to services, the burden of walking a few extra blocks, made greater by Mother Nature's occasional incorrigibility, is not 'substantial' within the meaning of RLUIPA." *Id.* at 1228. *See also San Jose Christian College v. City of Morgan Hill,* 360 F.3d 1024, 1035 (9th Cir.2004) (finding no substantial burden when city zoning laws "may have rendered [the] [c]ollege unable to provide education and/or worship at the Property, [but] there is no evidence in the record demonstrating that [c]ollege was precluded from using other sites within the city" for such purpose); *Lighthouse Institute for Evangelism, Inc. v. City of Long Branch,* 406 F.Supp.2d 507, 515–16 (D.N.J.2005) (city ordinances prohibiting use of property as church within redevelopment zone did not impose substantial burden when suitable alternative venues were available in 90% of the rest of the city, and presence of church within zone would most likely not contribute to redevelopment), *rev'd on other grounds,* 510 F.3d 253, No. 061319, slip op. (3rd Cir. Nov. 27, 2007). *Cf. Sts. Constantine and Helen Greek Orthodox Church, Inc. v. City of New Berlin,* 396 F.3d 895 (7th Cir.2005) (when a city's conditional use permit procedure involved inconsistency, delay, and expense amounting to bad faith and resulting in a negative outcome for a church's planned use of purchased property, the city's denial of the church's permit application was a substantial burden), *rehearing and rehearing en banc denied,* March 7, 2005.

In the case at bar, the Church's intended use of the sign for which it sought area variances—to inspire its congregants and passers-by and to recruit eastbound travelers on I–695—is a form of "religious exercise" protected by RLUIPA. As discussed previously, Congress intended a broad definition of "religious exercise" to encompass any use of land for a religious purpose. Evangelism of this sort qualifies as a religious purpose. We hold, however, that the Church's religious exercise was not "substantially burdened" by the Board's denial of its variance requests. The variance denial did not compel the Church to modify the behavior of its congregants so as would "violate [their] beliefs." *Lovelace, supra,* 472 F.3d at 187. Nor can we say that the variance denial rendered "effectively impracticable" the Church's use of a sign as a means to inspire its congregation and recruit new members.

As the cases discussed above make clear, in determining whether a zoning regulation imposes a "substantial burden" on religious exercise, it is important to consider whether there are effective alternatives to the denied proposed use. Here, the Church has multiple alternative means to preach to and inspire sought-after-members other than by use of a sign that is significantly larger than what the zoning regulations allow. The existing sign that faces I–695 is visible to the passing public and, while not as highly noticeable as the Church would like, serves the same purpose, just to a lesser degree.[4]

As a "regional" congregation that draws members from the greater Baltimore County area, even into Pennsylvania, the Church could spread its word and recruit members by means of commercial billboards and signs, as would a business seeking to advertise its product. For-rent billboards and signs can serve the same function as the Church seeks for its proposed replacement sign. Although having to rent a sign might be

---

**4.** In addition, the Church has another sign on its Property frontage facing West Joppa Road that it could develop further under BCZR 450.4—including by adding electronically changeable type to communicate inspirational messages.

more expensive and less convenient for the Church in its religious exercise, it does not compel members of the congregation to violate or modify or forego their religious beliefs or precepts. *See Lovelace,* 472 F.3d at 187 (citing *Thomas, supra,* 450 U.S. at 717–18, 101 S.Ct. 1425 and *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

In this case, there is no implication of bad faith on the part of the Board due to needless delay and expense in the variance consideration, as was present in *Sts. Constantine and Helen Greek Orthodox Church,* 396 F.3d at 901. And, for the reasons discussed in section I, the variance denial was not "so utterly groundless as to create an inference of religious discrimination" as RLUIPA was meant to combat. *Petra Presbyterian Church v. Village of Northbrook,* 489 F.3d 846, 851 (7th Cir.2007), *cert. denied,* —— U.S. ——, 128 S.Ct. 914, 169 L.Ed.2d 786, 2008 WL 59852 (2008). Instead, the Board merely required that the Church be governed by the same land use regulations as any other institution or business with property abutting I–695.

In sum, the Church has not been denied *any* use of a sign as a means of evangelism, but only the non-conforming use of a sign that cannot be as large and eye-catching as the Church might desire. Denial of its variance request burdens the Church's religious exercise, but not substantially, so as to make any use of a sign for uplift and recruitment "effectively impracticable" or to compel the congregants to "violate [their religious] beliefs." The Board properly interpreted the "substantial burden" standard in RLUIPA; and, on the record before it, did not err in concluding that the Church did not meet that standard.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**